FREMONT OIL COMPANY, AN OHIO CORPORATION, PLAINTIFF, *v.* MARATHON OIL COMPANY, AN OHIO CORPORATION ET AL., DEFENDANTS.

Common Pleas Court, Sandusky County.

No. 33204.

Messrs. *McAfee, Hanning, Newcomer, Hazlett & Wheeler,* by *Mr. Arthur G. Taylor* and *Mr. William K. Tell, Jr.,* for the plaintiff.

*Mr. John W. Gee* and *Messrs. Shumaker, Loop & Kendrick,* by *Mr. Charles W. Peckinpaugh, Jr.,* for the defendant, Marathon Oil Company.

*Mr. Leo W. Kinny,* for the defendants, Robert E. Mehling et al.

GABEL, J.   This matter comes on to be heard on the pleadings, the evidence and the briefs of counsel.

Basically, this is a suit alleging a conspiracy on the part of all the defendants to commit certain acts of unfair competition, and plaintiff prays for a permanent injunction, accounting of profits, cancellation of distributorship contracts between Marathon Oil and the individual defendants and such other equitable relief as plaintiff may be entitled to in the premises.

Defendants generally deny the actionable charges made by the petition.

The individual defendants were for the most part, long time employees of Fremont Oil Company.   Robert E. Mehling, eight years; Urban Miller, eighteen and a half years; Kenneth Ohms, seven and a half years; Edward T. Hallier, twenty-seven years; Louis M. Dolweck, six years; Ken L. Hirt, one and one-half years.

Miller, Ohms, Hallier, Dolweck and Hirt, the last named on a part time basis, were tank truck drivers for Fremont Oil Company serving approximately twelve hundred customers with petroleum products with special emphasis on gasoline and fuel

oil. Mehling, in addition to other general duties, was the route supervisor and liaison representative between the drivers and the management. None of the drivers had entered into a restrictive contract forbidding them to compete territorially or otherwise upon termination of employment with Fremont Oil.

Prior to October 1, 1962, the stock of Fremont Oil was apparently wholly owned by Harold Gabel and John Lehmann, or members of their immediate families. On October 1, 1962, Fremont Oil became a wholly owned subsidiary of Standard Oil of Ohio. Shortly thereafter, Russell G. Mantz, the new manager, called a meeting of all the employees and assured them as to job security and indicated there would be merit raises when warranted. It is interesting to note from the testimony of the tank truck drivers, that they had received no pay raise for a period of from three to five years under the previous management. However, probably encouraged by the statement of Mr. Mantz that there would be merit raises when warranted and disappointed that raises were not promptly forthcoming, the drivers and Ed Miesle, the latter not a party to this suit, sometime early in December of 1962, met at the Ohms residence primarily to discuss a pay raise. It was agreed they would stick together, make their demand as a group, but would postpone any request for a raise until after Christmas so as not to jeopardize the payment of an anticipated Christmas bonus.

Thereafter, Ed Miesle without waiting for group action, requested a pay raise and got it promptly. He was never invited to attend any further group meetings.

The next meeting was held either late in December or early in January 1963, at the home of Urban Miller. Robert Mehling either asked or was invited to attend this meeting and was accompanied by his father-in-law John Lehmann, one of the former major stockholders of the Fremont Oil Company. As a leverage to use with Fremont Oil, it was suggested to the drivers at this meeting that they contact another oil company. This was agreed upon and it was also agreed that Mehling would represent the group in any negotiations with another company. It is quite obvious from the testimony of all the individual defendants that from and after the meeting at the Miller home,

no further thought was given to making any demand for any wage adjustment with Fremont Oil.

From and after this meeting, all approaches, contacts and negotiations with Marathon, were carried forward for and on behalf of the drivers by Mehling until the meeting of the drivers with representatives of Marathon at Holiday Inn on January 28th.

In accordance with the agreement reached at the meeting at the Miller home, Mehling sought out representatives of Marathon and began negotiations for employment for the entire group. As a result of prolonged negotiations beginning early in January 1963 and after Mehling had had at least ten contacts or meetings with Marathon representatives, on February 7, 1963, Mehling signed a contract with Marathon as a Class A distributor, and Miller, Hallier, Ohms and Dolweck, signed contracts with Marathon as Class B distributors.

It must be noted that all of these negotiations and meetings between Mehling and/or the drivers with Marathon, occurred while the group were still trusted employees of Fremont Oil and without the knowledge of Fremont Oil.

After signing the distributorship contracts on February 7, the drivers, or Mr. Mehling, had a total of thirteen more meetings with representatives of Marathon while still employees of Fremont Oil.

Before leaving Fremont's employ and in furtherance of their objectives, the drivers or their representative, Mr. Mehling, with the knowledge and tacit consent of Marathon, (1) kept their intentions a complete secret; (2) agreed to resign en masse without notice on March 4, 1963, by leaving a note on Ron Miller's desk at Fremont Oil in the following language.

"Ron, sorry we had to go this way. We are all with Marathon Oil Company. Goodbye for now and good luck. We'll be seeing all of you. Tell all the boys and Russ.

(Signed) Urb, Eddie, Louis, Ken,
Zeke, Ken Hirt"
(Plaintiff's Exhibit No. 22)

(3) gave Marathon complete customer lists torn from Fremont Oil analysis sheets and supplemented from memory by the drivers; (4) gave Marathon full information as to Fremont

credit policies; (5) gave Marathon information as to quantity discounts and special price discounts enjoyed by preferred customers of Fremont Oil; (6) began soliciting some of Fremont Oil customers to switch to Marathon. This was done by all of the drivers and by Mehling as well, as evidenced by the testimony of each of them. (7) disclosed to Marathon, Fremont Oil's method of computing sealed public agency bids; (8) disclosed to Marathon customer gallonage figures and equipment located at consumer and re-seller accounts; (9) upon leaving, took keys to Fremont Oil customer tanks; (10) prior to leaving, took all route lists from Fremont Oil vault; (11) took trailer court list; (12) removed from office of Fremont Oil and destroyed 4 re-seller contracts.

All of the foregoing are facts fully substantiated by the evidence.

Apparently, these employees had no feeling of obligation or duty to their employer, and had no realization that in good morals as well as under the mandate of the law, they were required to be faithful in their employment and to refrain from engaging in practices harmful to the interests of their employer. On this score see 35 Ohio Jurisprudence (2d), 700, Section 78, wherein it is stated as follows:

"The employee is bound to the utmost good faith toward his employer and to be loyal and faithful to his interests and to not act in antagonism or serve a private interest of his own in opposition thereto."

"There is an implied agreement on the part of the employee that he will faithfully serve and be regardful of the interests of his employer *during the term of his service* and carefully discharge his duty to the extent reasonably implied by the relation of employer and employee."

In considering the responsibility of Marathon in this matter, it is apparent its representatives knew the drivers and Mehling were still in the employ of Fremont Oil when it accepted from them customer lists taken from the analysis sheets, (Exhibit 6A-C) (Exhibits 21, 44, 47, 61 & 65); full information as to Fremont credit policies (Exhibits 7, 8, 9, 10, 11); information as to the quantity discounts and special price discounts enjoyed by preferred customers of Fremont Oil (Exhibits 66,

71); information as to method of computing public agency bids (Exhibit 20); information as to customer gallonage figures (Exhibit 4); information as to type of equipment used by consumer and re-seller accounts (Exhibit 27).

Admitting that some of this information might have been available from other sources, it could only have been available after prolonged research and long hours of observation and "spying" if you wish, which would have destroyed their plan of a quick take-over of plaintiff's tank truck business and put plaintiff on the alert to protect its interests.

Furthermore, Mr. Grant of Marathon, was aware that Mehling had in his possession several of Fremont's re-seller contracts and was further aware that he had destroyed at least one of them. (Garland or John Ash contract.) And, after its destruction, admittedly made one delivery to Ash between March 4th and March 8th and only decided it was violating the rules of the game when Sausser, another Marathon representative, on or after March 8th would not approve the contract Grant had entered into with Ash. (Exhibits 18, 19.) Marathon also negotiated re-seller contracts with Linders Market (Exhibit 54) and Floyd Bischoff (Exhibit 55). Here again, according to Mehling's testimony, Marathon was aware of the outstanding contracts with Fremont Oil.

Before severing employment, Mehling admitted that he had taken several re-seller contracts from the files of Fremont Oil, four or more of which he had destroyed. Here again, the purpose was to capture this business for Marathon and the four drivers and Mehling and this possibility, according to the testimony of Mr. Mehling, was discussed by him with Marathon at the meeting of February 12th at Rising Sun, Ohio.

In the case at bar, defendants not only gave Marathon a complete list of customers taken from the analysis sheets supplied to them by Fremont Oil, but also took with them all their route lists, plus a route list for the trailer courts with which none of the drivers had any knowledge as to name, address of customer or location of equipment, and all this before severance of employment with Fremont Oil. Marathon contends it had no knowledge that the route lists were to be taken. However, the testimony of all the drivers and Mr. Mehling indicates that

the discussion with reference to taking the route lists occurred several times in the presence of representatives of Marathon Oil Company.

These route lists were unusual in structure as evidenced by the following quotation from Mr. Ohms Monday route as shown on plaintiff's Exhibit No. 1:

"Out Route U. S. 12 east to Erlin, the sixth house on the right '(Gachwind Sawmill). Turn left on Erlin Road to first brick house on right (Walter Kistler). Go to second road, turn right on Gibbs Rd. to sixth house on right (Mrs. George Boebe). Go to Vickery Rd. and turn right to second house on right (Howard Bluhm)—to third house across the street from Gulf Station (Louis Toth)—to third house on left (Richard Sour)."

Page after page of all the route lists are constructed in the exact manner as shown above. Turning to page 2 of Exhibit No. 1, there is a detailed listing of gallonage capacity and the location of the tanks for each product for each customer. There is also indication as to where the keys may be found and as to the type of delivery to be made to each customer.

It is clear from the testimony of the drivers themselves, that the primary purpose of the route lists was to permit Fremont Oil to serve its customers with a substitute driver in case of illness, vacation, resignation or death of the regular driver, or, in the event of re-assignment of a route from one driver to another. The route lists served a further purpose in permitting maintenance and repair men to make the routes at least once a year for the purpose of renovating the equipment loaned by Fremont to its tank truck customers.

All of the drivers frankly admitted the route lists were taken to handicap Fremont in getting substitute drivers on the road and in order to get the jump on Fremont in contacting their former customers on the target date, to wit, March 4th.

It is clearly evident that they accomplished their purpose as shown by Exhibit No. 98, prepared by a Marathon statistician. This Exhibit indicates clearly how deliveries by Marathon rose to unprecedented heights and deliveries by Fremont plummeted to unusual lows between March 4th and March 8th. The rise in deliveries for Fremont and the fall in deliveries for Marathon after March 8th was due to the temporary restraining order issued by this Court.

Defendants cannot cleanse themselves of their wrongdoing because they returned the route lists on March 8th in open court when the temporary restraining order was allowed. These lists were made up by the drivers at the direction and for the use of Fremont Oil Company in case of sickness, vacation, resignation or death of the regular driver and they were the property of Fremont Oil Company. The drivers were in error in believing these lists were their personal property.

Because of the en masse resignation of the drivers without notice, Fremont Oil had no one familiar with all the routes and without the lists, new drivers were completely at sea as to where deliveries were to be made.

There is no dispute that employees not under a restrictive contract not to compete, *may after leaving the service of an employer*, solicit business from former customers where there is no disclosure or use of trade secrets or confidential information such as a route list or a list of customers regarded as confidential. However, in this case, we have a solicitation of various customers by all of the drivers as well as Mehling, prior to leaving the services of Fremont Oil. Each of the drivers testified that he had solicited customers whom he thought he could trust to keep the matter secret before his resignation on March 4th. Mehling testified that he approached Crown Battery, Haaser Sales, Stanley Root, John Ash, Bill Burns, Tilton's Marina, all while still in the employ of Fremont Oil and prior to March 4th. Furthermore, it is the opinion of this Court, that the route lists due to their detail and the manner of construction and the use to which they were to be put, were confidential, as was much of the information as to credit and pricing policies of Fremont Oil disclosed to Marathon. Marathon representatives themselves testified they considered credit and pricing policies confidential.

In this case, as distinguished from all others cited by plaintiff or defendants, we have a situation where all of the acts leading to unfair competition after severance of employment occurred *prior* to severance of employment.

Defendants contend that the case of *Curry* v. *Marquart*, 133 Ohio St., 77, is decisive of this case. Admitting that it is the law governing the right of an employee to compete with a

former employer "where there is no disclosure or use of trade secrets or confidential information relative to the trade or business in which he had been engaged and which he had secured in the course of his former employment," can it honestly be said that the Court in its decision in that case had in mind a situation as confronts us in this one and in the opinion at Page 79, did not the Court further state as follows:

"The authorities are quite uniform that disclosures of trade secrets by an employee secured by him in the course of confidential employment would be restrained by the process of injunction and in numerous instances attempts to use for himself or for a new employer information relative to the trade or business in which he had been engaged such as lists of customers regarded as confidential have been restrained."

Factually, therefore, the Court is of the opinion that injunctive relief is more warranted in this case than in any of the following Ohio cases in which an injunction was granted for unfair competition.

*Soeder* v. *Soeder*, 82 Ohio App., 71; *Patterson* v. *Pollock*, 84 Ohio App., 489; *French Bros. Bauer* v. *Townsend Bros. Milk Co.*, 21 Ohio App., 177; *Monitor Stove Co.* v. *Williamson Heater Co.*, 18 Ohio App., 352; *Smith* v. *Kernan*, 55 Weekly Law Bulletin, Page 145; *Crown Overall Mfg. Co.* v. *Levy Overall Mfg. Co.*, 16 NPNS, 561 and *White Baking* v. *Snell*, 28 NPNS New Series, 172.

In arriving at a conclusion in this case as to the continuance of the injunctive process, the Court wishes to quote from the opinion of Judge Oppenheimer in the case of *Crown Overall Mfg. Company* v. *Levy Overall Mfg. Co.*, Volume 16, NPNS New Series, Page 561:

"We are aware that under present economic conditions, it is the purpose of the law to foster competition. - - - But the competition thus fostered and encouraged must be legitimate. With the unfolding of our social conscience the ethical standard in the business world is being elevated. - - -

"We are demanding honesty of method and integrity of purpose in our industrial life. Misrepresentation and fraud elicit public condemnation. One who seeks to gain the confidence of the people must offer as a foundation for such con-

fidence, the merit of his own product and the honesty of his own methods.''

The individual defendants testified that if they had not been enjoined they would have taken anywhere from seventy-five percent to ninety percent of the tank truck business of Fremont Oil with them. They further testified that while making deliveries of Marathon products between March 4th and March 8th, each of them contacted somewhere in the area of seventy Fremont Oil customers, and that in the case of each driver, no more than three or four of former Fremont Oil customers refused to switch to Marathon. Apparently the customer attachment to these drivers is due to the fact of their long years of service in making deliveries to them, and their personal acquaintance with them.

The Court is aware that it takes time to train a new driver. Fremont Oil after the en masse resignation of their drivers, hired four new men who have been operating now for a period of approximately three months. The Court feels they must be given a reasonable time to become acquainted with the product they are selling as well as a reasonable time to establish proper customer relationships.

Realizing that injunction is a preventive remedy designed to guard against future injury rather than to be used as a club to punish wrongs already suffered, the Court is not inclined to grant an injunction for a prolonged period of time.

It is therefore the judgment of the Court that an injunction is allowed to November 1, 1963. Therefore, from the date of the filing of the Entry in this cause in accordance with this opinion to November 1, 1963, the individual defendants and Marathon shall not solicit any customer who was doing business with Fremont Oil Company as of March 4, 1963, by personal contact, by telephone, by letter, or by advertising which identifies the individual defendants as employees of Marathon and further advertises them individually as being in a position to supply petroleum products. The restraining order heretofore granted will remain in effect until the Entry in accordance with this judgment is filed.

- - - -

## DAMAGES

The authorities generally recognize the right of a Court

to award damages in an equity proceeding on the theory that having obtained jurisdiction, it may decide all issues and award complete relief even though the remedy granted may be in law rather than in equity.

"The principle of equity jurisprudence - - - that when a court of equity acquires jurisdiction for the purpose of giving equitable relief, it may give full relief although this may involve the determination of legal issues and the granting of legal remedies - - - is fully applicable to injunction cases. In this respect a court of equity once having acquired jurisdiction of a controversy will retain jurisdiction in order to provide present relief and do complete justice between the parties - - -"

"*Past damages may be awarded as incidental to injunction. But in no case where damages as such are given in equity will any element of exemplary or vindictive damages be included.*"

29 Ohio Jurisprudence (2d), 415, 416, Section 183; 20 Ohio Jurisprudence (2d), 87, 88, Section 39; Note 9 at Page 88— Citing numerous cases where damages are awarded there cannot be any element of the exemplary or vindictive included therein.

The Court will first give consideration to the claim of the plaintiff for allowance of attorney fees in this matter.

A recovery may be had for attorney fees only where punitive or exemplary damages would be warranted and where there is actual malice.

In the case of *Davis* v. *Tunison*, 168 Ohio St., 471, Judge Stewart, the author of the opinion, quotes from the case of *Roberts* v. *Mason*, 10 Ohio St., 277, as follows:

"In an action to recover damages for a tort which involves the ingredients of fraud, malice or insult, a Jury may go beyond the rule of mere compensation to the party aggrieved and award exemplary or punitive damages, and this they may do although the defendant may have been punished criminally for the same wrong. In such a case, the Jury may, in their estimate of compensatory damages, take into consideration and include reasonable fees of counsel employed by the plaintiff in the prosecution of his action."

Quoting further from the opinion of Judge Stewart we find the following language:

"We are of the opinion that before the question of punitive damages may be submitted to a Jury, the fraud, malice or insult connected with the tort must be *actual* and not imaginative."

Paraphrasing further some of Judge Stewart's language we find that to show actual malice, there must be evidence from which it can be reasonably inferred.

What is actual malice? As defined in 35 Ohio Jurisprudence (2d), 142:

"Actual or express malice has been defined as that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other persons. Legal or implied malice, on the other hand is that which the law infers from or imputes to certain acts and has been defined as that state of mind under which a person does a wrongful act purposely without a reasonable or lawful excuse to the injury of another."

Actual malice is usually motivated by anger, animosity, hatred, ill will, corrupt design, actual malevolence, spite, etc. For a further discussion of the distinction between actual malice and legal malice, the Court refers counsel to the case of *Waters v. Novak*, 355 of the 94th Ohio Appellate.

In the case at bar, the Court cannot find that there is sufficient evidence to indicate that the defendants acted through actual malice. And consequently, exemplary or punitive damages are not allowable and it further follows the Court cannot, therefore, award any allowance for attorney fees.

In considering the question of loss of profits claimed by the plaintiff, the Court is not limited to the prayer of the petition. The Court is permitted to grant plaintiff any relief warranted by the pleadings and the evidence.

"The prayer cannot restrict the nature of the relief which the facts set forth in the petition authorize, nor determine the nature of the relief to which the plaintiff is entitled."

"A prayer for general and alternative relief in a pleading under the Code, entitles the Court to grant the party any redress he might be entitled to upon the pleadings and the evidence." 43 Ohio Jurisprudence (2d), 102, Section 92.

In this case, plaintiff makes claim for future lost profits in the amount of $10,000.00 as set out in his brief at Page 34. Future lost profits can only be an element of damages when ''plaintiff makes it reasonably certain by competent proof what the amount of his loss actually is.'' (16 Ohio Jurisprudence (2d), 214, Section 80.) Nowhere in the record is there any competent evidence that will show with reasonable certainty as to what the future lost profits of the plaintiff will possibly be, if any. Damages in this area would be uncertain, speculative and conjectural. Consequently, the Court denies this claim.

The plaintiff also makes claim for restitution of salary paid to Robert E. Mehling in January and February of 1963 in the sum of $1,350.00. In the opinion of the Court, such an award of damages would be in the nature of punitive damages which the Court cannot allow.

Plaintiff also claims damages in the sum of $5,146.07 for services of personnel of Fleet Wing Corporation in supplying sales and promotional assistance on March 4th and thereafter for a few weeks. The Court is not too much impressed with the validity of this claim. Fremont Oil is a jobber - - - selling under the Fleet Wing brand name - - - And Fremont Oil and Fleet Wing Corporation in turn, are wholly owned subsidiaries of Standard Oil of Ohio. In my judgment, the submission of this statement for services by Fleet Wing to Fremont Oil, was an after thought to build up the case for damages. Fleet Wing in rendering this service, was protecting its own sales volume and this claim is also denied.

The only claim for damages that the Court is going to give any serious consideration to, is the claim for loss of profits for the month of March and the month of April, 1963, during which time it is apparent that plaintiff was seriously handicapped by the acts of these defendants.

On this score, the testimony of Norbert Koch, fairly substantiates as a fact that Fremont Oil in March and April of 1963, suffered an average loss of $3,240.90 during each of those months and it is therefore the judgment of the Court, that the plaintiff is entitled to a judgment, jointly and severally, against the defendants in the sum of $6,481.80.

Counsel for plaintiff will draw Entry in accordance with

this opinion and exceptions will be noted for all parties in interest.