THE STANDARD OIL COMPANY, APPELLEE, *v.* LANDMARK
FARM BUREAU COOPERATIVE, APPELLANT; COOK ET AL.,
APPELLEES.

(No. 76AP-146—Decided October 21, 1976.)

Messrs. *Vorys, Sater, Seymour & Pease,* for appellee
Standard Oil Company.

Messrs. *Lucas, Prendergast, Albright, Gibson, Brown
& Newman,* for appellant.

*Messrs. Stevenson & Duckworth,* for appellees Ronald Cook et al.

STRAUSBAUGH, P. J. This is an appeal by defendant-appellant (hereinafter referred to as Landmark) from the judgment of the Court of Common Pleas dated February 18, 1976, permanently enjoining Landmark until September 26, 1976, from servicing with petroleum products any person formerly served by Ronald Cook, while under contract with the Standard Oil Company.

The judgment and decree appealed from, states as follows:

*"Judgment and Decree*

"This case came on to be heard upon the complaint of the plaintiff, the answers of defendants Franklin Landmark, Inc., Ronald Cook, Jo Ann Cook, Dan Cook and Dave Cook and the evidence. At the conclusion of the evidence, all parties having rested, the court required all the parties to submit proposed findings of fact and conclusions of law and they did so.

"Upon the evidence, the court made the following findings of fact and conclusions of law:

*"Findings of Fact*

"I. Plaintiff The Standard Oil Company, hereinafter called Sohio, is a corporation duly organized and existing under and by virtue of the laws of the State of Ohio having its principal place of business in Cleveland, Ohio.

"II. Defendant Franklin Landmark, Inc., hereinafter called Landmark, is a nonprofit corporation duly organized and existing under and by virtue of the laws of the State of Ohio having its principal place of business in Hilliard, Ohio.

"III. Sohio is engaged in the business of selling and distributing petroleum products in the State of Ohio, using the name Sohio to identify its products.

"IV. Landmark is engaged in the business of selling and distributing petroleum products and was the biggest competitor of Sohio in the area served by Defendant Ronald Cook.

"V. On June 30, 1975 Defendant Ronald Cook entered into a contract with Sohio which designated Ronald Cook as Distributor and identified his primary area of responsibility as a certain part of the southeastern corner of Franklin County. Said contract provided, among other things, as follows:

"(a) 'Distributor hereby agrees to act in said capacity in such area and in such other areas adjacent thereto as he shall elect and agrees diligently to promote the sale of the Company's products which are stocked at the bulk plant designated by the Company for such areas.'

"(b) '15. Covenant not to Compete. For a period of one (1) year from the date of termination of this Agreement, regardless of how arising, the Distributor, in consideration of the Company's goodwill in the above-mentioned primary area of responsibility which has resulted from the quality of its products, its customer service, its advertising and other factors, shall not, within said area and with respect to the motor fuels, oils and other products of the Company sold and marketed by the Distributor hereunder, directly or indirectly, either on the Distributor's behalf or on behalf of any other party or in association with any other party, solicit, divert, take away or attempt to solicit, divert or take away any of the customers with whom the Distributor shall have dealt while acting as Distributor hereunder or any of the custom, business or patronage of the Company, or interfere with any dealings or transactions, actual or prospective, between the Company, on the one hand, and any of its customers and patrons, on the other; provided, however, that if the Distributor has been a Distributor for a total period of less than six (6) months under this Agreement or under this Agreement and a similar preceding agreement with the Company on the date of termination of this Agreement, the provisions of this paragraph shall not apply.'

"(c) '13. Termination.

" 'Either party may cancel this Agreement without cause by giving not less than thirty (30) days' prior written notice to the other. In addition, the Company may can-

cel this Agreement by written notice to Distributor at any time should Distributor fail to perform in any material respect the obligations which are required to be performed by him hereunder.'

"VI. Before June 30, 1975 Ronald Cook for many years has been distributing petroleum products for Sohio in said area under similar preceding agreements.

"VII. During the months of June, July and August of 1975 Ronald Cook:

"(a) Approached Marathon Oil Co. and proposed to sell it his petroleum business, to-wit: the goodwill and customer contact advantage gained while he was under contract with Sohio during 27 years and suggested to that company that he was in a position to transfer to it the customers which he had served for Sohio.

"(b) Approached Landmark on or about August 17, 1975 and offered to sell his petroleum business to Landmark, proposing to transfer to Landmark the goodwill and customer contacts which he had gained while under contract with Sohio with a view to transferring to Landmark the customers for petroleum products which he had serviced for Sohio during many years at a price of $25,000.

"(c) During the period of July, August and September the number of gallons of petroleum products which he sold and delivered for Sohio in his territory diminished as follows:

| 1973 | 1974 | 1975 |
|---|---|---|
| July 30,722 | July 37,759 | July 18,776 |
| Aug. 42,592 | Aug. 27,633 | Aug. 16,800 |
| Sept. 33,190 | Sept. 45,344 | Sept. 6,906 |

"VIII. On Septembr 25, 1975 Sohio mailed to Ronald Cook a notice of cancellation of said contract for cause, to be effective September 26, 1975 and said letter was delivered to Ronald Cook on September 26, 1975.

"IX. Ronald Cook on September 29, 1975 sent a letter dated September 24, 1975 to the 600 customers which he had serviced for Sohio under his contract of June 30, 1975 and under previous contracts, wherein he tried to persuade said customers to cease doing business with So-

hio and to transfer their business to Landmark. Enclosed in said letters were brochures of the Landmark burner service setting forth the terms and conditions under which Landmark would furnish that service.

"X. Defendant Dan Cook had delivered Sohio petroleum products for his father, Ronald Cook, to the Sohio customers served by Ronald Cook under the contracts described in paragraphs V and VI, for four years.

"XI. Dan Cook was present at the conference described in paragraph VII(b) above, wherein Ronald Cook tried to sell his business and proposed to transfer the Sohio customers to Landmark. Landmark rejected that offer but on August 19, 1975 hired Dan Cook to be Landmark's driver in the territory in Franklin County in which Dan Cook had serviced the Sohio customers for Ronald Cook while Dan Cook was employed by Ronald Cook.

"XII. At the time Landmark employed Dan Cook as its driver in said territory, Landmark furnished no more than four (4) customers to Dan Cook to be serviced by him in said area. At said time Landmark already had other drivers servicing Landmark's customers in the area assigned by Landmark to Dan Cook.

"XIII. The contract entered into between Landmark and Dan Cook provided that he was to be paid 1 cent a gallon for deliveries and 1½ cents a gallon additional for new customers which he obtained for Landmark. Landmark expected and hoped that Dan Cook would secure for Landmark the customers of Sohio which Dan Cook had serviced for Sohio while in the employ of his father, Ronald Cook. Landmark never employed any other driver salesman on such terms.

"XIV. Dan Cook was in the employ of Landmark as a truck driver and salesman delivering petroleum products of Landmark from August 19, 1975 to October 10, 1975 when he was temporarily laid off because he became incapacitated in an automobile accident.

"XV. One of Dan Cook's duties for Landmark in said work for Landmark was to get Landmark new customers.

"XVI. On September 29, 1975 Dan Cook obtained

from the office of Landmark 600 copies of Landmark's advertising brochures respecting their burner service. Dan Cook delivered those 600 brochures to his father, Ronald Cook, knowing that Ronald Cook intended to send those 600 brochures to all the Sohio customers which Ronald Cook had serviced for Sohio under his contract with Sohio with the letter described in paragraph IX above.

"XVII. Dan Cook during the time of August 19 to October 10, 1975 while in the employ of Landmark, secured from the office of his father, Ronald Cook, information on the records of Ronald Cook which Ronald Cook had been furnished by Sohio, which data included names, addresses, credit information, the tank size of the customer and what was known as the "K" factor, being a factor from which it could be computed when the customer would next need a fill of heating oil. Important parts of this information were placed by Dan Cook on the invoices used by him with respect to Landmark's products and was used by Dan Cook in his work for Landmark.

"XVIII. 186 out of 504 current customers of Sohio, which had been served by Ronald Cook as Sohio's distributor during the year 1975, transferred their accounts from Sohio to Landmark during the time Dan Cook was working for Landmark as Landmark's distributor. Including the 186 customers referred to above, Dan Cook served 221 customers for Landmark.

*"Conclusions of Law*

"A. During the months of July, August and September of 1975, Ronald Cook breached his contract of June 30, 1975 with Sohio and Sohio was justified in cancelling said contract on September 26, 1975 for cause.

"B. Ronald Cook violated clause 15 of his contract of June 30, 1975 in which he had agreed not to compete with Sohio for a period of one year after the termination of his contract for any reason. Said clause was reasonable.

"C. Dan Cook was acting for Landmark within the scope of his employment of securing and servicing customers for Landmark, in assisting his father, Ronald Cook, to send out Landmark brochures to the customers which

Ronald Cook had served for Sohio with the letter asking those customers to transfer their business from Sohio to Landmark. Said action was wrongful.

"D. Dan Cook was acting within the scope of his employment for Landmark in securing information from Ronald Cook's files which had been furnished by Sohio to Ronald Cook for use in his work for Sohio and used that information in obtaining and servicing for Landmark customers which his father, Ronald Cook, had serviced for Sohio under the contract between Ronald Cook and Sohio. Said action was wrongful.

"E. The information referred to in paragraph D above was confidential information belonging to Sohio and was furnished by Sohio to Ronald Cook solely for the purpose of servicing said customers for Sohio.

"F. As a result of the act set forth in paragraphs B, C and D above, Sohio has been and is being and will continue to be irreparably damaged and Sohio has no adequate remedy at law.

"G. In order to prevent said irreparable damage referred to in paragraph F above, Ronald Cook must be permanently enjoined and restrained for a period of one year expiring September 26, 1976 from directly or indirectly transferring or attempting to transfer Sohio customers formerly served by Ronald Cook to Landmark or any other competitor of Sohio, and from persuading or attempting to persuade any persons whom he served with petroleum products while under contract with Sohio to transfer their accounts to Landmark or any other competitor of Sohio and to make purchases of their petroleum product needs from any one other than Sohio, and Landmark must be permanently restrained and enjoined for a period of one year expiring September 26, 1976 from servicing with petroleum products any persons who had formerly been serviced by Ronald Cook while under contract with Sohio.

"H. That Dan Cook must be permanently restrained and enjoined from using information which he obtained from the records of his father, Ronald Cook, respecting the customers which Ronald Cook had served for Sohio.

"I. That Sohio recover from Ronald Cook, Dan Cook and Landmark its costs herein.

"The court coming now to enter its judgment and decree upon said findings, which set forth the reasons for the issuance of this decree.

"It is hereby ordered, adjudged and decreed that Ronald Cook be, and he is hereby permanently enjoined and restrained until September 26, 1976, from directly or indirectly transferring or attempting to transfer customers of the The Standard Oil Company, formerly served by Ronald Cook, to Franklin Landmark, Inc. or to any other competitor of The Standard Oil Company and from persuading or attempting to persuade any persons, whom Ronald Cook served with petroleum products while under contract with The Standard Oil Company, to transfer their accounts to Franklin Landmark, Inc. or any other competitor of The Standard Oil Company and to make their purchases of their petroleum product needs from anyone other than The Standard Oil Company.

"It is further ordered, adjudged and decreed that Franklin Landmark, Inc. be, and it is hereby, permanently enjoined and restrained until September 26, 1976, from servicing with petroleum products any persons who had formerly been served by Ronald Cook while under contract with The Standard Oil Company. Franklin Landmark, Inc., however, may service any such persons who had become for all their petroleum products customers of Franklin Landmark, Inc. before August 17, 1975. Where persons who were customers of The Standard Oil Company for one type of petroleum product and customers of Franklin Landmark, Inc. for another type of petroleum product before August 17, 1975, Franklin Landmark, Inc. may continue to service such persons with the type of petroleum product furnished them by Franklin Landmark, Inc. before August 17, 1975.

"It is further ordered, adjudged and decreed that Dan Cook, be, and he is hereby, permanently enjoined and restrained from using the records of Ronald Cook respecting the customers which Ronald Cook had served

for The Standard Oil Company or any data which he had copied from said records.

"It is further ordered, adjudged and decreed that The Standard Oil Company recover from Ronald Cook, Dan Cook and Franklin Landmark, Inc. its costs herein.

"The preliminary injunction heretofore issued on November 3, 1975, is dissolved with respect to defendants Jo Ann Cook and Dave Cook, and with respect to Ronald Cook, Dan Cook and Franklin Landmark, Inc. is modified to conform to this decree. * * *"

Landmark's first assignment of error states:

"The trial court erred by issuing a permanent injunction against appellant when appellant was not a party to the contract between the appellee and Ronald Cook and had not committed any acts of unfair competition."

Landmark does not seem to seriously question the findings of fact made by the trial court. The main issue seems to concern the law which should be applied to these facts. While some of the acts of Landmark were not wrongful, others clearly were acts of unfair competition against the plaintiff. Certainly the using of the mailing list in the possession of Ronald Cook, which was restricted for the use of plaintiff and not plaintiff's competitor, was an act of unfair competition. Also, the use of the computer information including "K" factor by defendant through its agent Dan Cook was an act of unfair competition. It is stated in *Fremont Oil Co.* v. *Marathon Oil Co.* (1963), 92 Ohio Law Abs. 76, headnote six, that where a route supervisor and several tank truck drivers jointly planned to leave the employ of a petroleum jobber without notice and accept employment with a competitor; retained route lists and delivered these and other confidential information to the competitor; and before changing employment solicited customers to transfer business with them to the intended employer, a temporary restraining order was properly granted against the employees and their new employer four days after the change of employment, to prevent the further solicitation of customers of the former employer. In this case, Dan Cook was acting in the scope of his employ-

ment for Landmark in assisting his father, Ronald Cook, a former employee of plaintiff, to send out Landmark's brochures to plaintiff's customers seeking to have them transfer their business to Landmark. Dan Cook also was acting within the scope of his employment for Landmark in securing information from his father Ronald Cook's files, which had been furnished by Landmark to Ronald Cook, which assisted Landmark and Dan Cook in obtaining and servicing plaintiff's customers for Landmark.

The court in *Fremont, supra,* at page 86, quoted from an earlier case, as follows:

" 'We are demanding honesty of method and integrity of purpose in our industrial life. Misrepresentation and fraud elicit public condemnation. One who seeks to gain the confidence of the people must offer as a foundation for such confidence, the merit of his own product and the honesty of his own methods.' "

The first assignment of error is overruled. The second assignment of error claims:

"The trial court erred by issuing against appellant a permanent injunction that inhibits lawful competition by appellant and grants to the Standard Oil Company an unlawful monopoly."

Undoubtedly, any injunction issued by a court restraining acts of unfair competition has the effect of causing some lessening of competition during the period of the injunction. However, courts have not felt inhibited in the issuance of such injunctions where the restraints limiting acts of unfair competition are reasonable. An example is *Raimonde* v. *Van Vlerah* (1975), 42 Ohio St. 2d 21, where the court held that a covenant not to compete will be enforced against an employee to the extent necessary to protect the employer's interests. In *Fremont, supra,* the court held that where a route supervisor and several tank truck drivers jointly planned to leave the employ of a petroleum jobber without notice and accept employment with a competitor, route lists prepared by the driver at the direction of his employer, including information as to the location of each customer; the capacity and location

of each customer's tank; and where keys could be located, with sufficient detail to permit a replacement driver to serve the customers without other assistance, is the property of the employer. The court held that injunctive relief is properly extended to prevent the solicitation by the employees and their new employer of plaintiff's customers for a period of approximately eight months from the change of employment, which the court found reasonable. We find that the injunction issued herein is proper and not over broad. The trial court in the granting of the remedy to the plaintiff attempted to eliminate the effects of the unfair practices of Landmark. The trial court properly found monetary damages not to be sufficient and that there was a need for injunctive relief in order to put the plaintiff back in the position which it occupied prior to the acts of unfair competition by Landmark. Landmark's assignment of error is overruled.

The third assignment of error maintains:

"Assuming *arguendo* that appellant should be enjoined, the trial court erred in granting an excessively broad and sweeping injunction against the appellant."

This assignment is overruled for the same reasons set forth in our ruling upon the second assignment of error, and for the additional reasons that the injunction restraining Landmark is as specific as can be feasibly drawn under the circumstances, in that the defendant should know from the order of the trial court what it was prohibited from doing. We find nothing improper about the injunction in that it was made for a limited time only as was the injunction in *Fremont*. Defendant's third assignment of error is overruled.

The fourth assignment of error reads:

"The trial court erred by receiving in evidence the depositions of defendants without deciding objections made by defendants during the depositions and without affording defendants the opportunity to make at the trial additional objections respecting the depositions."

Although it is certainly better practice that depositions be read into evidence in order that a party oppos-

ing the admission of the deposition into evidence may have an opportunity to have the court rule on specific objections, defendant has not pointed out how it has been prejudiced thereby, or that the trial court abused its discretion. Inasmuch as the trial was to the court, without the intervention of a jury, it undoubtedly was more practical for the court to examine the depositions at its own convenience. In the absence of any citation of testimony that should have been excluded in the deposition, we find no abuse of discretion on the part of the trial court nor prejudicial error and, therefore, overrule defendant's fourth assignment of error.

Defendant's fifth assignment of error states:

"The trial court erred by issuing a preliminary injunction against appellant without a hearing."

The preliminary injunction issued November 3, 1975, recites:

"This cause came on to be heard upon the motion of the plaintiff for a preliminary injunction, the notice of the hearing having been served upon all of the defendants. Counsel for all of the defendants were present at the hearing. * * *"

The court assumes that the procedures recited in the order of the trial court were true and that the proceedings were regularly held in accordance with the Civil Rules. Therefore, in the absence of proper evidence to the contrary, the mere assertion in appellant's brief is insufficient to sustain this assignment of error. In any event, we find that the issue raised in this assignment is moot. Defendant's fifth assignment of error is overruled, and the judgment is affirmed.

*Judgment affirmed.*

McCORMAC, J., concurs.
WHITESIDE, J., concurs in part and dissents in part.

McCORMAC, J., concurring. I agree that the judgment of the trial court should be affirmed. Ronald Cook was an in-

dependent distributor of Standard Oil Company rather than an employee. However, as ancillary to his distributorship contract and as a part thereof, Ronald Cook convenanted not to compete with Standard Oil Company for a period of one year in his trade area from the date of the termination of his agreement. Such a covenant ancillary to a business franchise is valid and not an unlawful restraint of trade if it is reasonable under the facts and circumstances of the particular case. See annotation, 50 A. L. R. 3d 746; 54 American Jurisprudence 2d 959 and 965, Monopolies, Sections 512 and 518. The trial court did not err in its factual finding that the covenant not to compete was reasonable, even though covenants not to compete are more strictly construed in conjunction with a business franchise than with a sale of property.

Ronald Cook was properly found by the trial court to have breached his covenant not to compete, as it is clear that on behalf of Landmark and in association with an employee of Landmark Ronald Cook attempted to divert customers from Standard Oil Company to Landmark. The more troublesome area of this case is whether damages can be assessed against Landmark as a result of its involvement with Ronald Cook in the breach of his covenant not to compete.

Competition in business, even though carried to the extent of ruining a rival, constitutes justifiable interference in other business relationships, and is not actionable so long as it is carried on by means that are lawful. See 45 American Jurisprudence 2d 308, Interference, Section 31. The better holding, however, is that the right of competition does not justify a person to knowingly procure a breach of a valid contract. Thus, tortious interference with a contract constitutes an act of unfair competition that is wrongful if the party seeking damages shows the existence of a valid contract, the wrong-doer's knowledge thereof, an intentional procurement of the breach and damages resulting therefrom. See 45 American Jurisprudence 2d 314, Interference, Section 39. The trial court was within its prerogative under the evidence in this case in finding that

those elements were proved and that Landmark, through its employee, Dan Cook, who was acting in the scope of his employment, induced Ronald Cook to breach his contract with Standard Oil Company. Thus, Standard Oil was properly found to be entitled to a judgment against Landmark.

The final issue concerns the measure of damages recoverable. Generally, damages allowable in a case of this nature are the loss of profits resulting from the tortious act of a defendant. However, in this case, proving damages is extremely difficult for plaintiff, if not impossible. If proof of money damages is so difficult or speculative that there is no adequate remedy at law, in accordance with the general rules of equity, an injunction can be granted in an appropriate case. The trial court found that plaintiff did not have an adequate remedy at law. That finding is supported by sufficient evidence.

In considering whether to issue an injunction as well as the terms and circumstances thereof, the trial court must balance many factors. The court must consider factors such as the effects of an injunction upon the competitive balance in the area served. In considering this fact the court can of course consider the size of the respective entities (Standard Oil Company and Landmark) and the possibility of creating a monopoly in the event an injunction is granted. In this particular case, there is no indication that Standard Oil will have a monopoly in the affected area during the one-year period when the injunction is in effect. Balancing the equities of the parties is a prerogative of the trial court within the equitable discretion of the trial court. Considering the tortious activity of the defendants, the extreme difficulty of proving actual damages, the difficulty of remedying the wrongful conduct of defendants by money damages and the relatively small effect upon the competitive market, this court cannot say that the trial court wrongfully weighed the equities in deciding within its equitable jurisdiction to issue the injunction. We might disagree with the injunction and might have issued no injunction or a more narrow injunction

had we been the trial court. However, I do not believe that we can find that the trial court exceeded its equitable jurisdiction in rendering its judgment.

The judgment of the trial court should be affirmed.

WHITESIDE, J., concurring in part and dissenting in part.

Although I respect the opinions of my colleagues, I cannot concur with the majority because the result herein, as contended by the second assignment of error, grants what is tantamount to an unlawful monopoly to one of the giants of the oil industry—the Standard Oil Company—monopoly meaning dominant, not necessarily exclusive.

The injunction granted herein does not enjoin one of plaintiff's former employees from competing pursuant to a limited reasonable noncompetition clause of the employment contract. None of the defendants were ever employees of Standard Oil Company—most assuredly not appellant Landmark, who is, and has been, the largest "competitor" of Standard Oil in the area.[1]

That "competitor" has been for the most flimsy of justifications, enjoined from competing with Standard Oil in a portion of southeastern Franklin County.

But really, the most important factor in this case is that Standard Oil had no business and no customers in the area to protect. I repeat, Standard Oil had absolutely no customers in the area. The only customer Standard Oil had in the area was defendant Ronald Cook who had operated an independent business as a distributor of Standard Oil products in the area under a contract making him an independent contractor. The agreement in paragraph 10 expressly provides that *"the business conducted by the Distributor hereunder is the independent business of the Distributor."* Paragraph 10 further provides:

"* * * None of the provisions of this Agreement

---

[1] Actually, Landmark was a distributor of oil and thus a competitor of Ron Cook rather than Standard Oil, there being no evidence that Landmark was an oil company in that sense.

shall be construed as reserving to the company any right to exercise any control over the business or operations of the Distributor contemplated hereunder, or to direct in any respect the manner in which the business or any operation shall be conducted, it being the intention hereof that the entire control and direction of the activities of the Distributor's business hereunder shall be and remain with the Distributor. * * *''

In light of the foregoing provisions, there can be no question but that the customers are those of the distributor and not those of the Standard Oil Company. The distributor, Ron Cook, was not an employee or agent of Standard Oil serving Standard Oil customers. In fact, the agreement further expressly provided in paragraph 10:

"* * * Distributor is authorized to use the words 'Distributor—The Standard Oil Company (Ohio)' on his stationery, delivery tickets, and equipment, *but he shall not represent himself as an agent or employee of the company.''*

Obviously, if the contract called for Ron Cook to deliver Standard Oil products to Standard Oil customers, he, of necessity would be an agent or employee of Standard Oil.

The noncompetition clause further reinforced the concept that the customers were those of Ron Cook, not Standard Oil, by providing that the consideration for the noncompetition clause is "the company's goodwill in the above-mentioned primary area of responsibility which has resulted from the quality of its products, its customer service, its advertising, and other factors." Service to its own customers by Standard Oil would not constitute consideration to Ron Cook but service by Standard Oil to Ron Cook's customers would.

The agreement, in paragraph 10, also makes it clear that persons employed by Ron Cook in connection with his "independent business" were solely the employees of Ron Cook and not in any way employees of Standard Oil. This, of necessity, would include Ron Cook's son, Dan Cook.

Even assuming the validity of the noncompetition clause (which although debatable is not an issue herein

since Ron Cook has not appealed),[2] there can be no question that the noncompetition clause does not apply either to Dan Cook (who had no contractual relationship with Standard Oil although a former employee of Ron Cook), nor to appellant Landmark by virtue of its employment of a former employee of Ron Cook or otherwise.

The essential facts are that Ron Cook for approximately twenty-six years operated an independent business as a distributor of Standard Oil products under distributorship contracts with Standard Oil, the last of which became effective June 30, 1975. At the same time, Standard Oil terminated the agreement with Ron Cook insofar as he had been the operator of a bulk station at Pickerington. Ron Cook was accordingly forced to travel a considerable distance to pick up Standard Oil products in another part of the county, adding significantly to Ron Cook's cost of operation. (Ron Cook was changed from "Sohio Bulk Tank Distributor" to "Tank Wagon Distributor.") Cook, on or before August 1975, offered to sell his "independent business" to Fleetway, Marathon, and to Landmark. None were interested since, in light of the noncompetition clause, Ron Cook had nothing to sell despite the 26 years he had spent building up his "independent business."

Dan Cook had been employed by his father Ron Cook. In August 1975, Dan Cook left the employment of Ron Cook and was employed by Landmark in a similar position and was to be paid 1½ cents per gallon for all new business he obtained. Dan Cook used his own recollection and his father's handwritten list of customers to call on those customers of his father he had previously called on while employed by his father and attempted to have such customers of his father continue to purchase from him by switching to Landmark products. Dan Cook also looked in his father's records on occasion to obtain a "K factor" of some customers, which information had been supplied to Dan's father, Ron Cook, by Standard Oil through use of a computer.

---

[2]See annotation, 26 A. L. R. 2d 219.

Shortly prior to Standard Oil's termination of Ron Cook's agreement as "Sohio Bulk Tank Distributor" and relegation of him to "Tank Wagon Distributor," effective June 30, 1975, Ron Cook had participated in the organization of a "union" of Sohio distributors and became the president of that organization which had sought recognition for collective bargaining with Standard Oil.

The relationship between Standard Oil and Ron Cook further deteriorated (stemming at least in part from Dan Cook's activities as an employee of Landmark). Finally, by letter dated September 25, 1975, Standard Oil notified Ron Cook that it was cancelling the distributor agreement between them. By letter dated September 26, 1975, Standard Oil notified Ron Cook's customers of the distributor change directing them to a distributor in Lancaster. By letter dated September 24, 1975, but mailed September 29, 1975, Ron Cook also notified his customers that he was no longer a distributor for Standard Oil.

Ron Cook, however, did not merely stop with such notification. He stated: "we are changing suppliers," and urged his customers to continue with him and Landmark and enclosed a Landmark pamphlet. The pamphlet had been obtained from the Landmark office by Dan Cook at his father's request. The trial court found that Dan Cook furnished the pamphlets to his father on September 29, 1975, knowing that his father intended to send them to his former customers. Eleven days later (October 10, 1975, as found by the trial court), Dan Cook's employment with Landmark ceased because he became incapacitated in an automobile accident.

The trial court made no finding of fact as to whether the acts of Dan Cook in (1) using his father's list of customers, (2) using his father's records to find the "K factor" in some instances, which had been furnished to his father by Standard Oil, and (3) in furnishing his father the Landmark pamphlets, were performed within the scope of his employment with Landmark. Rather, the trial court found this issue as a matter of law. There is no basis in the record for finding as a matter of law that Dan Cook acted within the scope of his employment. In any event, even assuming

that he did, this does not *ipso facto* entitle Standard Oil to injunctive relief against Landmark. The Supreme Court held in *Curry* v. *Marquart* (1937), 133 Ohio St. 77:

"In the absence of an express contract not to engage in a competitive pursuit, an employee, upon taking a new employment in a competing business, may solicit for his employer the trade or business of his former customers and will not be enjoined from so doing at the instance of his former employer where there is no disclosure or use of trade secrets or confidential information relative to the trade or business in which he had been engaged and which he had secured in the course of his former employment." (Syllabus.)

See also *Cord Co., Inc.,* v. *S & P Management Services, Inc.* (1965), 2 Ohio App. 2d 148.

These cases clearly establish that there was absolutely no wrongdoing of any nature on the part of Landmark in hiring Dan Cook with the full expectation that he would solicit his father's customers whom he had previously served on his father's behalf and attempt to obtain them as customers of Landmark. Likewise, there was no wrongdoing on the part of Dan Cook in agreeing to do so.

As to customer lists, the evidence is clear and overwhelming that the customers upon whom Dan Cook called to solicit for Landmark were former customers of his father in the *independent business* he operated on his own behalf. More importantly, it is clear that Dan Cook had never been an employee of Standard Oil. Any information he had or obtained *could not* have been obtained as a result of his employment with Standard Oil because he had never been its employee. Likewise, nothing Ron Cook did resulted from employment with Standard Oil because he had never been an employee of Standard Oil.

For more than 26 years, Ron Cook had operated his own independent business, having a contractual relationship with Standard Oil. Effective June 30, 1975, Standard Oil changed that contractual relationship and then complained that Ron Cook did not sell as many products as he did under the previous arrangement.

At about the same time, Ron Cook learned that the

"independent business" which he he had spent nearly 27 years building up was not sellable because of his contract with Standard Oil. Ron Cook also has since learned that Standard Oil can, overnight, terminate the independent business he spent nearly 27 years establishing, claim his customers as its own, and prohibit him for one year from engaging in the only occupation he has known for 27 years, throwing him into the ranks of the unemployed without the benefit of unemployment compensation, since Standard Oil has avoided paying such taxes by the contract. But, for purposes of this case, Standard Oil insists that Ron Cook not be treated as the operator of an independent business but, rather, as an agent of Standard Oil acting on its behalf dealing with its customers.

If, as the contract expressly provides, Ron Cook was the operator of an independent business, then the customers with whom he dealt were *his* customers and not customers of Standard Oil. It must be remembered that, during the first six weeks of, approximately, the two-month period Dan Cook was employed by Landmark, he operated in direct competition with his father, Ron Cook, who was still in business.

As to the use of the "K factor," even assuming that Dan Cook acted improperly, there is no showing that this in any way assisted him in convincing customers to purchase from him as an employee of Landmark rather than from his father who was the Standard Oil distributor, or from the Lancaster distributor after September 26, 1975.

The letter dated September 24, 1975, and mailed September 29, 1975, poses a different problem. Ron Cook in sending the letter probably violated paragraph 15 of his agreement with Standard Oil, assuming its validity. The very language of the letter constituted a solicitation *by Ron Cook* for his customers *to continue to deal with him* but as a distributor for Landmark, rather than Standard Oil.[3]

Ron Cook told his customers in the letter that he was continuing in business, but that "it is impossible to supply

---

[3]There is no evidence Landmark induced Ron Cook to do anything. Rather it unsuccessfully attempted to dissuade him.

your oil needs through Sohio," but that "Landmark has agreed to supply us and you with oil for your needs adequately." The first statement was true; the second was not. There is no evidence that Landmark ever agreed to supply oil to Ron Cook. The letter concluded "let us continue to serve you."

To bind Landmark to that letter is both contrary to the evidence and unrealistic. Landmark neither had any arrangement with Ron Cook nor authorized the letter. The only "connection" was that Dan Cook obtained the Landmark pamphlets which Ron Cook enclosed with the letter. This is far too nebulous a basis for justifying the widesweeping injunction enjoining a nonprofit corporation like Landmark from competing with an industrial giant like Standard Oil.

In order to justify an injunction, irreparable injury must be demonstrated. Where the alleged unfair competition is by a nonprofit corporation against a large corporate industry, more than some isolated "loss" of 186 "customers" (of 504 served in the area) must be demonstrated. It must be demonstrated that the ability of the large industry to compete with the nonprofit corporation has been substantially impaired by the alleged act of unfair competition. There is no such showing here.

Even assuming that an act of unfair competition attributable to Landmark can properly be found predicated upon the record herein, Standard Oil is not entitled to the relief granted. There must be demonstrated that the injunctive relief is necessary to maintain the competitive balance. Here, instead of attempting to restore and maintain the competitive balance, the trial court granted a virtual monopoly to Standard Oil for a period of one year.

In any case of alleged unfair competition between businesses, the relative competitive position of the businesses is of concern. The law first tends to protect the small business from being forced out of business by a much larger business with an inherent competitive advantage. Of concern next is the protection of businesses of substantially equal size and competitive advantage. Of last and least concern is protection for the large company from

being "sniped" at, even unfairly, by a much smaller business. To justify injunctive relief, the large company must demonstrate that the "unfair competition" by the much smaller competitor has irreparably affected the overall business of the company. Here, the most that has been demonstrated is a slight temporary effect that can easily be overcome by Standard Oil in having a distributor available to call upon Ron Cook's customers.

By the time of trial, any vestige of competitive advantage obtained "unfairly" had been eliminated. In fact, the "high-handed" tactics utilized by Standard Oil, as demonstrated by the record, has probably caused more loss of good-will and business for Standard Oil than any act of Landmark, Dan Cook, or Ron Cook.

Finally, even assuming an "injury" to Standard Oil, it was not irreparable. Only 186 of some 504 customers of Ron Cook, and claimed by Standard Oil, were obtained by Dan Cook for Landmark.

The amount of oil that Landmark sold to such customers during the one-year period of the injunction would be easily provable as would the amount Ron Cook sold to the same customers the previous year. Likewise, the amount of profit Standard Oil would have made from "selling" such oil to Ron Cook (or to the Lancaster distributor) for delivery to such customers should also be easily provided. In other words, money damages are readily and easily provable in this case. Any argument that Standard Oil would lose some competitive advantage by Landmark's not being enjoined from servicing the customers is spurious. Neither Cook would be involved in deliveries for either Landmark or Standard Oil. Each would "deal" with the customers on their own merits if no injunction had been granted.

I am especially reluctant to extend the doctrine of restraint of trade to the circumstances herein involved even if I could agree with the majority in other respects. There is no precedent for the type of restrain of trade hereby imposed and I feel public policy favors a continuation of competition under such circumstances.

·.' For the foregoing reasons, I would sustain all the assignments of error except the fourth, finding no *prejudicial* error with respect to the rulings on the objections to the depositions. Accordingly, I would reverse the judgment of the trial court as to Landmark (the other defendants not having appealed), and remand the cause to that court for a proper modification of the judgment, leaving Landmark free to seek relief from the injunction bond because of the improperly obtained preliminary injunction.