The **HOME GAS CORPORATION OF MASSACHUSETTS, INC.**, Plaintiff,

v.

**DeBLOIS OIL COMPANY**, et al., Defendants.

Civ. A. No. 86–0195B.

United States District Court, D. Rhode Island.

July 29, 1987.

John H. Blish, William R. Landry, Blish & Cavanagh, Providence, R.I., for plaintiff.

William F. McMahon, McMahon & McMahon, Providence, R.I., for defendant DeBlois Oil Co.

Edward L. Gnys, Gunning, Lafazia & Gnys, Providence, R.I., for defendant C.H. DeBlois Gas Co.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

Home Gas Corporation seeks injunctive relief and damages against Defendants DeBlois Oil Company and C.H. DeBlois Gas Company. Home Gas contends that the Defendant companies violated a covenant not to compete for two years included in the Distributorship Agreements between Home Gas and DeBlois Oil. Home Gas seeks to restrain Defendants from engaging in the same business as Plaintiff, from soliciting its customers and also requests damages. The Court finds the Plaintiff is entitled to injunctive relief enjoining Defendants from soliciting its customers and compensatory damages.

Home Gas is a Massachusetts Corporation involved in retail sale of liquid propane gas (hereinafter LPG) under the trade name "Homgas" and the sale of LPG through distributorship arrangements. DeBlois Oil, a Rhode Island Corporation, has done business under such an agreement with Home Gas since 1961.[1] In 1961 the companies entered into a "Distributor Agreement" and a "Distributor Bulk Gas Service Agreement." Home Gas transferred 1186 customer service accounts and about 2400 storage cylinders marked "Homgas" to DeBlois Oil in August, 1961. Home Gas transferred an additional 2027 customer service accounts and approximately 3000 "Homgas" storage cylinders in the early 1970's. By 1976, DeBlois Oil's territory included the areas within 40 miles of DeBlois Oil's offices in East Greenwich and Chepachet, Rhode Island. In 1976 DeBlois Oil and Home Gas entered into a new Distributor Agreement and Distributor Bulk Gas Service Agreement for the East Greenwich and Chepachet territories. These agreements remained effective, subject to periodic price changes, until the twenty-five year business relationship ended in February, 1986. It is these agreements which are the basis of this action.

The Distributor Agreements were for a period of three years and were to continue from year to year unless terminated by either party. Home Gas was to deliver supplies of LPG on consignment to DeBlois Oil. The LPG was to be delivered in cylinders that were to remain the property of Home Gas. DeBlois Oil was responsible for storing the cylinders and seeing that they bore the Home Gas Company's trade name "Homgas" and were used only to carry out the agreement. The distributor, DeBlois Oil, was to solicit customers using written forms furnished by Home Gas. Only an officer of Home Gas could effectively sign the customer contract. DeBlois Oil was to sell to the customer "for the account of the company [Home Gas]." Home Gas was to set periodically the pricing schedules as well as provide DeBlois Oil with sales, promotional, and technical assistance. The distributor was to maintain all the equipment connected with the distribution of Homgas. It also was to maintain all necessary records and make periodic reports to Home Gas. DeBlois Oil

1. In 1961 DeBlois Oil Company was doing business through two subsidiary corporations known as M. Rosenberg Company and Booth Brothers. In 1976 these two subsidiaries were merged into DeBlois Oil. For the purpose of this opinion the Distributor will be referred to as DeBlois Oil and not the separate subsidiaries.

received a commission of 40% of the retail selling price as compensation. Upon termination of the contract, all equipment, cylinders and records were to be returned to the company.

The first of the two key clauses of these agreements is entitled "Use of Company Property." It states that the distributor "shall not deal with or sell any other liquified propane gas than ... Homgas." This restriction includes any filling of company cylinders. The distributor was to notify the company immediately if the equipment was being used for any other purpose.

The second clause, most central to this conflict, is entitled "Post–Contractual Obligations." The agreements state as follows:

In view of the knowledge which may be acquired by the Distributor of the Company's Consumer accounts, its business methods and trade practices, and to induce the Company to enter into this Agreement, the Distributor covenants and agrees that he will not during the term of this Agreement nor for two years after termination hereof directly or indirectly, engage in the business, occupation or trade of selling, marketing, bottling or otherwise dealing in liquefied petroleum gas, which is used, intended or designated for cooking, heating or refrigeration, nor in the selling, distribution, marketing, bottling or servicing of any liquefied petroleum gas tanks, gas cylinders, or gas equipment used or intended to be used in connection with the distribution, marketing, consumption or use of such gas, either as owner, partner, employee, employer, stockholder, director, officer, clerk, principal, agent or in any other relation or capacity whatever, nor shall he perform similar services nor be similarly engaged for himself or for any other person, firm or corporation engaged in a like or competing line of liquefied petroleum gas business in which the Company is now or may during the term of this Agreement be engaged in the territory hereinbefore described. During

the aforementioned period, the Distributor shall not furnish or disclose to anyone, other than to the Company, the names of any Customer accounts nor any other information obtained by the Distributor during the term of this Agreement relating to the Company's business or this agency.[2]

This provision has at least two discreet elements. It prohibits competition by the distributor during the term of the agreement and for two years thereafter. In addition, during the same time period, the distributor may not disclose the names of any customers or other information "obtained by the Distributor during the term of this agreement." As will hereafter be explained, the agreement not to compete is unreasonable and therefore unenforceable. The agreement not to disclose customer names is enforceable, has been violated, and Plaintiff is entitled to an injunction and damages.

In addition to the 1976 Distributor Agreements, DeBlois Oil and Home Gas executed Bulk Gas Service Agreements. These agreements incorporated all terms set forth in the Distributor Agreements. The supplemental agreements of February 27, 1976, also incorporated the terms of the original Distributor Agreements. Both the Distributor and Bulk Service Agreements were later supplemented by updated pricing structures effective September 1, 1984.

In the course of their twenty-five years in the LPG business these two companies were always bound by a written agreement. Over the long span, however, the operating conduct of the parties became more relaxed than the explicit terms outlined in the Distributor and Bulk Agreements. Instead of consignment sales, Home Gas billed DeBlois Oil for bulk purchases for which DeBlois paid from its own funds. DeBlois Oil solicited customers on behalf of Home Gas on its own contract forms without the written consent of an officer of Home Gas as required to effectuate the sale under the contract. Nor was Home Gas furnished with copies of these

**2.** Both the Chepachet and East Greenwich agreements covered the area within a forty-mile radius from the distributor's place of business in each territory.

agreements. DeBlois Oil also extended credit to the customers despite the requirement in the agreements that all sales of Homgas to the customer were to be paid in cash unless authorized by Home Gas. The company did not authorize the extension of credit offered by DeBlois Oil.

In the spring of 1983 DeBlois Oil entered into negotiations with Home Gas to reconsider the arrangement between the parties. The proposal set forth by DeBlois Oil was "to change our historic association with Home Gas from that of an agent to that of a wholesale purchaser of the product." As part of their long-range goal DeBlois Oil had purchased a propane storage facility in Ashton, Rhode Island. The proposal included an offer to purchase tanks, equipment and customer records of Home Gas in an effort to restructure the relationship. Despite strong efforts by Charles DeBlois, Sr. and after his death, by his son Charles, negotiations ceased with no agreement reached.

DeBlois Oil is a family business with only family members as owners of the stock, both voting and non-voting. Three members of the family, Arthur DeBlois, Jr., Charles DeBlois, Sr., and Robert DeBlois ran the business. Charles DeBlois, Jr. joined the business and currently owns 25 of the 75 shares of voting stock in DeBlois Oil. Upon joining the company Charles became interested in expanding DeBlois Oil's LPG operation, something his father strived for and Charles hoped to achieve on behalf of his late father. Charles kept his uncles, Arthur, Jr. and Robert, apprised of his intentions to expand the LPG business. In a memorandum dated October 29, 1984, Arthur DeBlois, Jr. informed Charles of the contract between Home Gas and DeBlois Oil which included the two-year covenant not to compete.

On December 26, 1984, Charles, Jr. was elected Vice-President of LPG Operations by the DeBlois Oil Board of Directors. In this capacity Charles handled the business between DeBlois Oil and Home Gas. He had access to all the records relating to Home Gas including the names of customers, prices they were paying and how much LPG each customer was buying. Charles also attended LPG training seminars conducted by Home Gas.

In January, 1985, Charles incorporated the C.H. DeBlois Gas Company financed with a $10,000 loan from his uncles Arthur, Jr. and Robert DeBlois. Charles employed DeBlois Oil's corporate attorney, accountant and banker through whom a $250,000 line of credit was extended. C.H. DeBlois Gas Company is also insured under DeBlois Oil's insurance policy including general liability, automobile and worker's compensation. This arrangement was necessary since C.H. DeBlois was unable to obtain such insurance on its own. The new company purchased a van and three LPG bulk trucks from DeBlois Oil between August 8, 1985, and March 1, 1986, for a total cost of $10,750.[3] DeBlois Oil's insurance coverage of these vehicles continued after the sale to C.H. DeBlois. C.H. DeBlois used garage facilities owned by DeBlois Oil for servicing these four vehicles. DeBlois Oil also provided large storage facilities so that C.H. DeBlois could purchase large quantities of LPG at reduced costs.

From the time he began establishing this company to the present Charles remains an employee of DeBlois Oil and is paid a salary by it. He receives no salary from C.H. DeBlois. The company began its operation on August 1, 1985, the same date designated by Arthur DeBlois to discontinue DeBlois Oil's active solicitation of new LPG customers on behalf of Home Gas. Charles DeBlois, Jr. and Robert White, general manager of C.H. DeBlois, solicited LPG customers many of whom were customers of Home Gas serviced by DeBlois Oil. Charles testified that he passed on many customer lists including names, addresses and phone numbers of Home Gas customers to his general manager. Once a Home Gas customer agreed to buy from the C.H. DeBlois Gas Company after being told DeBlois Oil was terminating its distribution, Homgas cylinders were replaced by

3. The 1977 van sold to C.H. DeBlois Gas Company on December 26, 1985 for $250 was transfer- red to C.H. DeBlois by Charles DeBlois, Jr. acting as Vice-President of DeBlois Oil Company.

C.H. DeBlois Gas cylinders marked "De-BLOIS." C.H. DeBlois denied to Home Gas that this activity was going on. On November 20, 1985, DeBlois Oil informed Home Gas that it did not intend to renew its contracts. Home Gas requested the return of all their customer account records which were in the custody of Charles DeBlois, Jr. Many of the records returned were in disorder and some records were never returned despite the demand. Arthur DeBlois, Jr. threatened to destroy the customer records in DeBlois Oil's possession if Home Gas attempted to contact the customers once serviced by DeBlois Oil to apprise them of what had happened. Arthur DeBlois also told an anonymous phone caller in need of LPG that C.H. DeBlois Gas Company would be able to fulfill the request for LPG. The phone caller was an officer of Home Gas.

The Distribution Agreements and Bulk Gas Service Agreements were terminated by DeBlois Oil on February 26, 1986. The twenty-five year business relationship ended as well resulting in this action now before the Court.

The first issue this Court must decide is whether the covenant not to compete in the Distributorship Agreements between Home Gas and DeBlois Oil is enforceable. De-Blois Oil claims the issue is whether the distributorship agreements were discharged by abandonment by Home Gas, not whether the restraint is enforceable. It claims the contracts were abandoned by the activities of both parties in a manner inconsistent with the procedures set forth in the contract. For example, Home Gas billed DeBlois Oil and DeBlois Oil paid for bulk sales of gas. DeBlois Oil did not use Home Gas order forms and did not obtain the approval of a Home Gas officer as required to accept a new customer. Lines of credit were extended to customers despite language in the contract that sales were cash only. DeBlois Oil solicited customers, using its own forms, despite the contract provision to the contrary.

■ Defendant's argument of abandonment of the contract is on the claimed factual basis that the parties, by custom and practice, have changed their relationship from that of a consignment purchase and sale to that of supplier and independent contractor. The legal foundation of this contention consists of two opinions of the Rhode Island Supreme Court, *Jakober v. Loew's Theatre*, 107 R.I. 104, 265 A.2d 429 (1970) and *Barden v. Sarkin*, 73 R.I. 170, 53 A.2d 913 (1947).[4] Both these cases involve agreements to sell real estate in which the purchaser first sought to enforce a different agreement from the one made by the parties, and then later returned to the original agreement and sought to enforce it. Each case involved the unilateral action of only one of the parties to the agreement. The court defined abandonment as "a unilateral act". *Jakober*, 107 R.I. at 112, 265 A.2d at 433–434. Here the Defendants contend that both parties subscribed to a new form of relationship, more akin to the *Jakober* definition of rescission which requires a "mutual agreement by the parties to an existing contract to discharge and terminate their duties thereunder." *Id.* There is no evidence of rescission in this case. The relationship continued until terminated by written notice by DeBlois Oil given on November 20, 1985, effective in February, 1986. Further, the evidence is that the parties engaged in extensive negotiations in 1983 with DeBlois Oil's avowed purpose to accomplish a change in the relationship of the parties. They continued until as late as 1984 to exchange writings evidencing their relationship, suggesting that they each still regarded the written contracts to be significant aspects of their relationship. There is no "abandonment" as the Rhode Island Supreme Court has defined it.

■ A restrictive covenant is enforceable to the extent it is reasonable. *American Eutectic Welding Alloys Sales v. Rodriguez*, 480 F.2d 223 (1st Cir.1973). The Rhode Island Supreme Court has adopted

---

**4.** Although not cited by Defendants to the same effect, *see Bissonnette v. Hanton City Realty Corp.*, 529 A.2d 139, 141 (Supreme Court of Rhode Island, 1987); *Adams–Riker, Inc. v. Nightingale*, 119 R.I. 862, 865, 383 A.2d 1042, 1044 (1978).

the reasonableness standard set forth in the Restatement (Second) of Contracts (1981) in determining whether a covenant is reasonable. *Dial Media, Inc. v. Schiff,* 612 F.Supp. 1483, 1488–1489 (D.C.R.I.1985). Section 188 states:

(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonable in restraint of trade if

(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or

(b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.

Home Gas must show it has a legitimate interest in preventing DeBlois Oil from engaging in the same business and that it is not simply attempting to restrain competition. *Id.* at 1489. It must also show the restraint is reasonably limited in activity, geographic area and time. *Garelick v. Leonardo,* 105 R.I. 142, 147, 250 A.2d 354, 356 (1969). Whether the restriction is reasonable and therefore enforceable must be decided on the facts of the case within the framework of these limitations. *Mento v. Lanni,* 106 R.I. 683, 688, 262 A.2d 839, 841–842 (1970).

■ The reasonableness test for a restrictive covenant applies whether it involves the sale of a business and its good will or is ancillary to an employment contract. Although the contract in this case was in the form of a distributorship agreement, not an employment contract, the analysis of whether Home Gas has a protectable interest does not change.[5] *See e.g. Standard Oil Co. v. Landmark Farm Bureau Co-op.,* 52 Ohio App.2d 225, 369 N.E. 2d 785 (1976) (distributorship agreement restriction upheld using same argument as employment contract); *Mansfield v. B & W Gas, Inc.,* 222 Ga. 259, 149 S.E.2d 482 (1966) (franchise agreement restriction which is akin to an employment contract upheld.)

Plaintiff seeks enforcement of a two-year covenant not to compete anywhere in the Chepachet and East Greenwich territories once serviced by DeBlois Oil. It is clear that a prohibition against the sale of LPG to all customers in these territories results in an unfair restraint of trade. The energy market in these two territories is a diverse one. It is not only Plaintiff and Defendants who sell LPG within the territory, but others as well. LPG is a source of energy which when burned produces heat and is also used to heat air and water, and to cook food. There are other sources of energy available in the area besides LPG. Electricity also can be used to heat and cook. Oil is a fuel which can be used to heat air and water. Although, it has a limited market to provide cooking energy, it may be used for that purpose. The restraint of one distributor of LPG is unlikely to have an effect on this broad market.

The question is whether the restraint is reasonable. *Dial Media, Inc. v. Schiff,* 612 F.Supp. 1483, 1488–1489 (D.C.R.I.1985). The response must be that it is not reasonable at all. In the reality of things, it accomplishes nothing. Not only is the Plaintiff subject to competition within its own LPG industry, it is also subject to competition from other readily available sources of energy. Should Home Gas charge more for its source of energy than providers of electricity or oil, consumers would likely forsake it for other sources of energy. To the extent that Plaintiff seeks to enjoin these Defendants from offering its product in the market, the restraint is clearly unreasonable and enforcement of it must be denied. There is no purpose for the provision other than an anti-competitive purpose, and, it is therefore invalid. It is not possible to imagine a legitimate purpose to deny Defendants the opportunity to sell LPG in these areas except to avoid

---

**5.** It is clear that the relationship was not that of wholesaler/retailer as Defendants contend. In 1983 DeBlois Oil set forth a proposal to Home Gas "to change our historic association with Home Gas from that of an agent to that of a wholesale purchaser of the product." The change was not accomplished. Therefore an employment contract analysis can be applied to this distributorship restriction.

competition. This is not a proper basis equitable relief.

Plaintiff argues that the restraint is reasonable in order to protect; (1) long-term relationships; (2) confidential customer information; (3) good will, and (4) the franchise relationship between the parties. As hereinafter appears, the long term customer relationship and confidential customer information may be protected by a less draconian form of remedy. Plaintiff argues that its good will is the recognition of its trademark of "Homgas" but fails to demonstrate any tangible way in which that mark has been or will be damaged by competition from C.H. DeBlois Co. While it is doubtful that the nature of the relationship of the parties is that of a franchise, the contract did not make DeBlois Oil the sole distributor in the territories involved. Indeed, Home Gas has been a competitor of DeBlois Oil doing business as Lehigh Bottled Gas Service. In any event, C.H. DeBlois Co. does not pretend to sell Homgas, hence, no infringement results.

■ The Court, however, may narrow the scope of the relief sought to the extent the agreement is reasonable and does not unduly restrict competition. *See e.g. J.B. Prata, Ltd. v. Bichay,* 468 A.2d 266 (R.I. 1983). The Defendants can be enjoined from soliciting former customers of Home Gas if Home Gas proves it has a legitimate interest, other than the restraint of competition, in preventing DeBlois Oil from soliciting its customers within the two-year restriction period in the designated areas after the contract terminated.

■ Equitable protection will be provided against the competitive use of a list of customers which is confidential in nature. *Callahan v. R.I. Oil Co.,* 103 R.I. 656, 660, 240 A.2d 411, 413 (1968); *Colonial Laundries, Inc. v. Henry,* 48 R.I. 332, 336–37, 138 A. 47, 48–49 (1927). Whether a list is confidential generally depends upon how readily ascertainable the information is for a person conducting an independent investigation. *Zoecon Industries v. American Stockman Tag. Co.,* 713 F.2d 1174, 1179 (5th Cir.1983). As the *Callahan* court explains it, if a list of customers is classified

in a public directory or discoverable by any public display of their purchase of a product or service, the list is not confidential. 103 R.I. at 660, 240 A.2d at 413–414. The list of customers in *Callahan* was determined to be not confidential and therefore unprotectable where each retail customer openly displayed signs indicating the sale of Quaker State Oil products. *Id.*

■ The Defendants contend the Home Gas customer list and information is readily ascertainable because a person driving around the territory could look into a customer's yard to see the cylinders marked "Homgas." The Court disagrees with this contention for two reasons.

First, the *Callahan* Court refers to customer information that is readily ascertainable through ordinary business channels or business directories. *Id.* The procedure suggested by Defendants is not an ordinary business channel. In *Colonial Laundries,* for example, the defendant argued a list of laundry customers was not confidential because the list could easily be compiled by anyone who chose to follow the driver and observe his places of call. 48 R.I. at 336, 138 A. at 48. The Court disagreed and ruled the list of customers was confidential because the knowledge was imparted to the driver for the purpose of Colonial Laundries' business. The information was no less confidential in nature because an "energetic spy" was able to acquire the information. *Id.* at 337, 138 A. at 49.

The present set of facts is indistinguishable from *Colonial Laundries.* Home Gas passed on its list of customers to DeBlois Oil for the purpose of Home Gas' business. The agreement between the parties clearly stated DeBlois Oil was to solicit customers "for the account of the company [Home Gas]." It also stated that upon termination of the agreement the distributor would "have no rights with respect to business of any customers it solicited." The fact that additional names were added to the list by DeBlois Oil does not change the agreement or the confidential nature of the list. *See Colonial Laundries,* 48 R.I. at 336, 138 A. at 49.

The second reason Defendants argument fails is that even if the names and addresses of Home Gas customers were readily ascertainable, there was additional trade information compiled that is confidential. *See Zoecon Industries v. American Stockman Tag Co.*, 713 F.2d 1174 (5th Cir.1983); *American Eutectic Welding Alloys Sales Co. v. Rodriguez*, 480 F.2d 223 (1st Cir. 1973). In *American Eutectic* the employee was given customer cards with the name and address of each customer as well as each customer's specialized requirements, the contact person and the company's pricing policies. The court ruled this information, especially the pricing policies, was confidential and could not be used to benefit the former employee at the employer's expense. 480 F.2d at 226.

Charles DeBlois, Jr., as Vice–President of DeBlois Oil's LPG business, had access to valuable trade information in addition to the names and addresses of Home Gas customers he solicited as President of C.H. DeBlois. He knew the volume of LPG used by each customer, current prices being charged, credit histories and when a customer would need more LPG. Clearly this information was not readily ascertainable through a public source or looking into backyards. Further being privy to this information would give the Defendants an unfair competitive advantage over Home Gas if they were allowed to use the knowledge gained through the relationship with Home Gas. *American Eutectic*, 480 F.2d at 229.

■ Once Plaintiff has established its protectable interest it must also show the extent of the restraint is reasonable. If it covers a geographic area more extensive or if the restraint is to last longer than is required to protect the Plaintiff's interests the restrictive covenant is unreasonable. Restatement (Second) of Contracts § 188, comment d (1981).

The Distributorship Agreements between Home Gas and DeBlois Oil covered an area within a forty-mile radius from DeBlois Oil's place of business in Chepachet, Rhode Island and a forty-mile radius from its place of business in East Greenwich, Rhode Island. Since Chepachet and East Greenwich are about twenty miles apart there is a substantial overlap. From these facts it is apparent that both the geographic and time restraints are reasonable. In *Griggs and Browne Co. v. Healy*, 453 A.2d 761, 762 (R.I.1982), the Rhode Island Supreme Court upheld an injunction enjoining the Defendant from soliciting Plaintiff's customers anywhere within a seventy-five-mile radius of Plaintiff's office for a period of three years after termination of the agreement. *Compare Herreshoff v. Boutineau*, 17 R.I. 3, 19 A. 712 (1890). There the court sustained a demurrer where the restriction imposed a geographical limit throughout the state but the complainant only established a protectable interest in Providence. The court stated that the complainant could only be protected from teachers who could entice local students away which did not necessarily include people who were quite a distance from Providence. *Id.* at 7–8, 19 A. at 713–714. Unlike *Herreshoff*, however, Home Gas has an interest in the areas once serviced by DeBlois Oil. The limitation is reasonable since it does not go further than the territory under their agreement.

The two-year time restraint is reasonable as well. In *Max Garelick v. Leonardo*, 105 R.I. 142, 250 A.2d 354 (1969), the court struck down a restrictive covenant prohibiting Leonardo from purchasing grain from Garelick's source for a period of five years. The court reasoned this time restraint was unreasonable because it was meant only to protect Garelick's source of grain while imposing an undue hardship on the defendant who could not obtain the grain he needed for his business. *Id.* at 149, 250 A.2d at 357–358. The same is not true of the facts of this case. There is no undue hardship on DeBlois Oil. It is free to do business, with the exception of Home Gas customers once serviced by DeBlois Oil, in these areas. Additionally, DeBlois would be able to solicit Home Gas customers after the two-year restriction ends.

■ Once the Court determines that the restriction protects a legitimate interest and that the restraint is no greater than necessary for that protection, it must then

consider whether the promisee's interests outweigh the promissor's and is likely to injure the public. Restatement (Second) of Contracts § 188(1)(b) (1981). The promisee's interests include an interest to be free from unreasonable restraints of trade and an interest in earning a living. The restraint against Defendants from soliciting the Plaintiff's customers is not unreasonable where the Plaintiff has shown it has an interest that is protectable. *Dial Media, Inc. v. Schiff,* 612 F.Supp. 1483, 1489–1490 (D.C.R.I.1985). Nor does promisee's second interest in its livelihood outweigh Plaintiff's interests. The covenant not to solicit Home Gas customers only limits one area of DeBlois Oil's business for a limited duration, in a limited area. The restraint prohibiting solicitation of Home Gas customers is closely tailored to protect Plaintiff from unfair competition. *See American Eutectic Welding Alloys Sales Co., Inc. v. Rodriguez,* 480 F.2d 223, 228 (1st Cir.1973). It does not prevent DeBlois Oil from soliciting new LPG customers in the East Greenwich and Chepachet territories or becoming involved in the LPG business outside these two territories. It simply prohibits DeBlois Oil from taking advantage of customer information obtained during its prior relationship with the Plaintiff. A restraint that limits one field of many available to the promisee and limits the solicitation of former customers rather than eliminates competition generally is easier to justify. Restatement (Second) of Contracts § 188 comment g, (1981). The LPG operation is only one facet of DeBlois Oil's business. To restrict the sale of LPG to Home Gas customers in two defined territories will not prevent the company from soliciting its own LPG customers and engaging in other branches of its business. It cannot be said, then, that the promisee's interest outweigh those of the promisor.

■ The remaining issue for the Court to decide is whether DeBlois Oil breached the restrictive covenant through C.H. DeBlois. Plaintiff contends C.H. DeBlois, as an instrumentality of DeBlois Oil, violated the covenants by soliciting Home Gas customers within the restricted territories and time restraints. DeBlois Oil claims it is not responsible for the actions of C.H. DeBlois because the companies are two separate entities. C.H. DeBlois claims it is not liable to Home Gas for breach of the restrictive covenants because it was not a party to the distributorship agreements.

A covenant not to compete is enforceable against a person or company, not parties to the contract, but the alter ego or instrumentality of the covenantor who is a party to the contract. *See e.g. Miller v. Dixon Industries, Corp.,* 513 A.2d 597 (R.I.1986). A company in competition with the covenantee who hires a covenator knowing of the restrictive covenant also may be enjoined. *Standard Oil Co. v. Landmark Farm Bureau Co-op.,* 52 Ohio App.2d 225, 369 N.E.2d 785 (1976).

The standard for determining whether C.H. DeBlois was an instrumentality or "alter ego" of DeBlois Oil depends upon the totality of the circumstances surrounding the relationship between the two companies. *United Transit Co. v. Nunes,* 99 R.I. 501, 509, 209 A.2d 215, 220 (1965). Plaintiff must show the parent company so dominated the finances, policies and practice of the subsidiary that they must be treated as one and the same company. *Miller,* 513 A.2d at 597 (citation omitted). "Absent a showing of inequity, fraud, under-capitalization, or dominion by the parent corporation, separate corporate identities must be observed." *Id.* at 604. There is sufficient evidence to establish dominion by DeBlois Oil to show inequity so that separate corporate identities cannot be regarded as significant and must be ignored.

In *Duplan Corp. v. Deering Milliken, Inc.,* 444 F.Supp. 648, 689 (D.S.C.1977), the court lists various factors which may be considered in determining whether there has been such domination over the subsidiary that they should be treated as one and the same company. They include:

1. Common stock ownership;

2. Common directors or officers;

3. Financing of the subsidiary by the parent;

4. Incorporation of the subsidiary by the parent;

5. Gross inadequacy of capital for the subsidiary;

6. Payment by the parent of the salaries and other expenses or losses of the subsidiary;

7. The subsidiary has substantially no business except with the parent and no assets except those conveyed to it by the parent;

8. The parent uses the subsidiary's property as its own;

9. The executives of the subsidiary do not act independently but take orders from the parent corporation in the latter's interest.

Most of these factors are present here. C.H. DeBlois was so dominated by DeBlois Oil through its officer, Charles DeBlois, Jr. that it must be treated as a mere instrumentality of DeBlois Oil. Charles DeBlois, Jr. was the Vice–President in charge of LPG operations for DeBlois Oil and controls one-third of the company's voting stock. Although he left DeBlois Oil to start his own LPG company he still has an office at DeBlois Oil and is paid a full salary. Charles is the president and sole stockholder of C.H. DeBlois, a responsibility for which he receives no compensation. It is impossible to determine which hat he is wearing at any particular time.

Charles received a $10,000 loan to start the business from his uncles who are also officers and Charles' co-trustees at DeBlois Oil. DeBlois Oil has a corporate policy of making loans to family members for their business ventures. Although it has made such company loans totaling hundred of thousands of dollars, it argues the loan, in this instance, was "personal." DeBlois Oil also provides all the insurance for C.H. DeBlois including general liability, worker's compensation and auto insurance. C.H. DeBlois was unable obtain its own coverage so DeBlois Oil agreed to carry C.H. DeBlois on its policy.

C.H. DeBlois purchased a van and three LPG trucks from DeBlois Oil with Charles acting as an officer of DeBlois on the sale side of the deal and as an officer of C.H. DeBlois on the purchase side of the agreement. DeBlois Oil also supplied C.H. DeBlois with facilities to store and maintain the vehicles.

DeBlois Oil made other property available to C.H. DeBlois as well. C.H. DeBlois uses a large storage facility owned by DeBlois Oil. These two companies have exclusive use of the facility where Homgas and C.H. DeBlois LPG are stored. Since its inception C.H. DeBlois replaced cylinders used to store LPG marked "Homgas" with those marked "DeBLOIS." Not only was this action in violation of the contract but the company deliberately chose to label C.H. DeBlois cylinders "DeBLOIS", a mark indistinguishable from DeBlois Oil. When two companies are so intertwined that they share stock ownership, an officer, insurance, property, and in some instances, the company name, separate corporate identities cannot be observed. The fact that C.H. DeBlois began to solicit customers at the same time that DeBlois Oil ceased seeking customers cannot reasonably be attributed to coincidence.

 There is also sufficient evidence to show DeBlois Oil and C.H. DeBlois acted inequitably. Arthur DeBlois, Chairman of the Board of Directors of DeBlois Oil, issued a memorandum dated October 27, 1984, informing Charles of the restrictive covenants in its agreements with Home Gas. Despite this information Charles proceeded to establish his company, one of the reasons being that he wanted to circumvent the agreement with Home Gas. He testified he gave the names and addresses of Home Gas customers to his manager at C.H. DeBlois, who solicited customers away from Home Gas. It is clear Charles had access to this information as Vice–President of DeBlois Oil's LPG operation. To act in this manner, knowing it violated the restrictive covenants, is clearly inequitable.

 DeBlois Oil's conduct was equally unfair where it allowed one of its officers to found this company knowing it was in violation of the contract between DeBlois Oil and Home Gas. Its Board of Directors

also voted Charles, Jr. Vice–President of its LPG operations, a position that gave him full access to all LPG records including Home Gas. This was done at a time when DeBlois Oil knew of Charles, Jr.'s intention to start his own LPG business. It also referred new LPG customers to C.H. DeBlois even though the still-existing contract terms obligated DeBlois Oil to take new customers on behalf of Home Gas.

Where DeBlois Oil exercised such dominion over C.H. DeBlois and acted so unfairly it must be held responsible for the damages suffered by Home Gas. The Defendants are hereby permanently enjoined from soliciting LPG customers of Home Gas in the territories included in the Chepachet and East Greenwich Distributor Agreements. Under the terms of the written agreements the covenant not to disclose customer lists was to last two years from termination of the contract which occurred on February 26, 1986. It would be an idle gesture for the Court to grant an injunction that will terminate on February 26, 1988, but seven months from now. The injunction, therefore, is extended for a period of two years to begin on the date of the entry of judgment. *See Premier Industrial Corp. v. Texas Industrial Fastener Co.,* 450 F.2d 444, 448 (5th Cir.1971) *noted in American Eutectic Welding Alloys Sales Co. v. Rodriguez,* 480 F.2d 223, 229 (1st Cir.1973). The injunctive relief granted will be stayed thirty days to afford C.H. DeBlois time to notify the affected customers that they must arrange a different supplier for LPG. Notice shall be given forthwith.

The DeBlois Cross–Reference Customer Lists for East Greenwich and Chepachet (Exhibit 49) shows DeBlois Oil had 2,240 customers when it terminated its LPG operations. Lehigh acquired 1,300 of the customers, Home Gas acquired 500 and 295 customers were acquired by other LPG companies. Of the remaining 145 customers, fourteen customers were DeBlois Oil employees and their families, and four customers were DeBlois Oil subsidiaries. The information relative to these eighteen accounts cannot be considered confidential in nature due to DeBlois Oil's personal knowledge and relationship with them. These accounts should not be considered in determining the list of wrongfully solicited customers when determining injunctive relief or damages. Additionally, nine accounts were closed. There are about 120 Home Gas customers wrongfully obtained by Defendants, including DeBlois Oil long-term oil customers who must be treated as Home Gas LPG customers.

Plaintiff may recover as damages loss of profits resulting from the wrongful solicitations to date. *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984). A loss of profits should be established by a reasonable certainty and may not be recovered if too speculative. *Id.* Recovery of damages will not be denied if the evidence available to the Plaintiff sets forth a reasonable foundation upon which the Court can make a fair and reasonable estimate of the amount of damages. *Palmer v. Connecticut R. & Lighting Co.,* 311 U.S. 544, 557–559, 61 S.Ct. 379, 383–384, 85 L.Ed. 336, *reh'g. denied* 312 U.S. 713, 61 S.Ct. 609, 85 L.Ed. 1143 (1941); *Also see J. Truett Payne Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 565–567, 101 S.Ct. 1923, 1929, 68 L.Ed.2d 442 (1981). Since the damages are limited to a two-year period, proof of profits lost during that period may be estimated from past profits of the established business. *Palmer,* 311 U.S. at 559, 61 S.Ct. at 384. The Court is satisfied Plaintiff has produced sound evidence affording a reasonable basis for determining Home Gas' lost profits.

The estimated loss of profits to Home Gas from the time DeBlois breached the contract in February, 1986, to the present is approximately $50,579.39. This amount is arrived at by reference to Plaintiff's exhibits 188 and 189, as well as the testimony of William Durwin. Exhibits 188 and 189 are the 1984 and 1985 Home Gas Schedule of Net Profits for the DeBlois Oil Distributorship. In 1984 DeBlois Oil sold 334,143.2 gallons and in 1985, 364,660.1 gallons. The average of both years' sales is 349,401.65 gallons of LPG. The net profit in 1984 was .11368 cents per gallon

and .10547 cents per gallon in 1985. The average net profit is .10857 cents per gallon of LPG. The average number of gallons (349,401.65) times the average profit per gallon (.10857) is $37,934.54. This figure is Home Gas' average annual net profit and represents the approximate loss of its profits from February, 1986, to February, 1987. An additional amount of $12,644.85 (one-third of the annual profits) was added for the additional four months from February to June, 1987, Home Gas has lost profits. The amount of lost profits totals $50,579.39.

This leaves a total of 120 Home Gas customers wrongfully solicited by the Defendants. These customers represent .0536% of the total customer list of 2,240. That same percentage of the total damages equals $2,711.06 in profits lost as a result of Defendants' wrongful actions.

Home Gas also introduced evidence from the DeBlois Oil Physical Inventory Sheets (Exhibit 47), DeBlois Oil Shortage Sheet (Exhibit 153) and the Home Gas Distributor Inventory Sheets (Exhibit 155) to show the equipment losses incurred as a result of Defendants' breach of contract. The documents indicate 435 pieces of equipment, entrusted to DeBlois Oil but remained the property of Home Gas, could not be located when Home Gas did a physical inventory in the DeBlois territories of East Greenwich and Chepachet. The replacement value of this equipment was estimated to be $20,082.0. Plaintiff is entitled to these damages that resulted from DeBlois Oil and C.H. DeBlois' wrongful conduct. The total amount of losses to the Plaintiff, then, is $22,793.06, as determined from the available evidence.

Plaintiff also seeks punitive damages. These damages should be awarded to punish wrongful conduct which was intentional or malicious and to deter others from similar wrongful action. *Abbey Medical/Abbey Rents, Inc. v. Mignacca,* 471 A.2d 189, 195 (R.I.1984). Such an award is discretionary with the finder of the facts. *Id.* There is no deterrent purpose to be served here since the Defendants are enjoined from the date of the

Judgment. Although the Defendants' conduct is certainly not commendable it appears to arise more from the enthusiasm generated for a new venture than an act of malice. Punitive damages are not appropriate and are denied.

IT IS SO ORDERED.