DECISION
Plaintiff Aim High Academy, Inc. (Aim High) filed this action on October 14, 2008, together with a Motion for Temporary Restraining Order (TRO). In pertinent part, the TRO as requested and granted by a bench decision of the Superior Court prohibited former employees Lorin Jessen and Hanna Ricna-Jessen from working in any capacity in association with a gymnastics program.[1] The issues surrounding the Jessens' alleged employment at or association with RISE — a start up gymnastics facility in Warwick — was set down for hearing on a requested preliminary injunction. Testimony, as well as other evidence, was received on three separate occasions. Having considered the pleadings, the evidence presented, and the arguments made by the parties, plaintiff's request for injunctive relief is ripe for decision.
 Facts
Although hotly contested, the relevant facts are capable of succinct summary.
At age 22, Amy Bryant (nee Nelson), a lifelong gymnast and former member of the University of Rhode Island Women's Gymnastics Team, started a business to teach and train *Page 2 
young athletes in the sport of gymnastics. She eventually moved her business, Aim High, to a location on Route 2 in East Greenwich, Rhode Island, approximately the geographic center of this wonderful, if diminutive, state. Although Rhode Island boasts some 10 to 20 facilities at which gymnastics is taught, Aim High may be the largest training location, offering the greatest variety of programs.
Aim High, a member of the United States Gymnastics Association (USGA) and other related organizations, has flourished. Several years ago, Amy brought her father, Robert Nelson, into the business to handle financial matters. For the past eight years, Amy has also relied on Cheri Jackson to oversee many of the administrative and personnel functions, as well as manage overall, the women's gymnastics program. A fourth individual previously employed by Aim High is Defendant David A. Butziger. Mr. Butziger took over as the full-time facilities manager in 2005. Until he was fired in early 2008, he occupied an office at Aim High where he had access to the company's cash as well as its computer programs and stored data.[2] At present, Aim High has about 1200 students involved in cheerleading and both recreational and competitive gymnastics. Approximately 170 youth are on the "competitive team," participating in gymnastics meets throughout Rhode Island and, on some occasions, in several other states.
Defendant Lorin Jessen began learning gymnastics while stationed in Germany as a serviceman. He developed a keen interest in the sport and began what has been a lengthy career as a coach. He met his now wife, Hanna, at a gymnastics teaching facility in Florida. They later moved around the United States, eventually settling in Connecticut where they operated their own gym. Defendant Hanna Ricna-Jessen is a former member of the Checkoslovokian National Women's Gymnastic Team. She has competed at the highest level of the sport, participating in *Page 3 
the 1988 Olympics. Hanna retired from competition approximately 20 years ago and has since been employed as a gymnastics coach. She and Lorin have two children, one of whom, David, is a very promising athlete.
By 2006, the Connecticut gymnastics facility being operated by the Jessens was failing. At a gymnastics meet held that December in Providence, the Jessens met both Amy Bryant and Cheri Jackson. The Jessens indicated that they might be available to move to Rhode Island and join Aim High as part of the coaching staff. No agreement was reached in this regard. However, Aim High management was clearly interested in hiring the former Olympian and her husband. In January, the Jessens traveled to the Aim High facility in East Greenwich, meeting with Cheri Jackson to explore full-time employment. A variety of subjects were discussed including the length of the work week, salary, scope of duties, and type of classes the Jessens could expect to instruct. Job applications were provided to the Jessens to fill out and return. Despite Lorin's testimony that he had no recollection of ever signing a job application, [3] there is no doubt that the Jessens filled out, signed and returned job applications to Aim High sometime in late January 2007. (See Exhibits 3 and 4.)
Discussions concerning the future employment of the Jessens continued while they settled their business affairs in Connecticut. Most of the communication between the Jessens and Aim High was handled by Lorin who insisted on at least partial health insurance coverage. Lorin also expressed a desire to have Aim High waive any gym fee for their son and to allow David's coach to instruct both David and other students at the Aim High facility.
Aim High continued to be interested in hiring the Jessens to augment its cadre of some 15 coaches despite the receipt of a remarkable e-mail on February 17, 2007. The e-mail, sent by a colleague of Jackson located in Connecticut, warned Aim High that it should be careful with the *Page 4 
Jessens who enjoyed a poor reputation for honesty in the "CT Gymnastics community." (Exhibit 5). This was because the Jessens could not be trusted with student information.[4]
Apparently motivated to protect its business interests from future misconduct by the Jessens, Aim High asked its attorney to prepare non-compete agreements to be executed by the Jessens. Subsequently, draft agreements were provided to the Jessens to look over and discuss with Aim High management. The central factual issue in this dispute is whether or not written, non-compete agreements were eventually signed by the Jessens.
The Jessens and their two children moved to Rhode Island around February 2007, while their negotiations concerning employment were still ongoing. They rented a house from the mother of Defendant Butziger and established their children in local schools. Both Lorin Jessen and Hanna Ricna-Jessen testified that although they received draft non-compete agreements to look over at their leisure, they never signed them. Both indicated that they remembered that there were "discrepancies" with the proposed agreements, but their memory was less than clear as to what those issues were. It is clear from the text, as well as the title of the employment contracts, that a non-compete feature was included. (See Exhibits 1, 2 and 9.)
This Court finds that the testimony by Aim High representatives concerning the written agreements was substantially more credible. The Court accepts the testimony of Robert Nelson regarding the execution of the agreements as accurate.
Nelson testified that during the first week of March, the time period when the Jessens began instructing at Aim High, he met with them and Cheri Jackson at the Aim High office suite. He briefly went over the revised draft of the employment/non-compete agreement, and asked the *Page 5 
Jessens whether the current draft[5] of the employment agreement failed to address unresolved issues regarding their employment. No issues were raised by the Jessens. Nelson recalled that the Jessens signed their individual agreements in his and Cheri Jackson's presence.[6] The executed agreements were then witnessed and placed in what was usually a locked file cabinet to which only few employees had access. One of these employees was (then trusted) David Butzinger.
Both Lorin and Hanna began their full-time employment at Aim High on March 5, 2007. Their son, David, received free tuition and was allowed to bring his personal coach to Aim High. The coach, Tristan Hollaman, is the only other Aim High employee to have ever signed an employment/non-compete agreement. Hollaman remains a coach at Aim High even though David has moved his training to other facilities.
By early December 2007, problems developed with the coaching being performed by Hanna. Because the Jessens were not working a 40-hour week as had been anticipated, their compensation was changed to an hourly rate as opposed to salary. By May 2008, Aim High made a decision to exercise its right to terminate the Jessens "without cause." The language of identical letters addressed to them dated May 19, 2008, advised the Jessens that Aim High had decided to exercise "one of its options under the non-competition agreement dated March 2007. Thecompany is exercising its right under paragraph (8) to terminate youremployment with fifteen (15) day's written notice to the employee." (See Exhibits 7 and 8.) (Emphasis added.) The fact that the termination letters refer to a specific provision of the non-competition *Page 6 
agreement strongly corroborates the fact, established by the testimony of both Robert Nelson and Cheri Jackson, that written agreements were signed by the Jessens.
Curiously, the signed employment/non-compete agreements, previously filed away in the personnel folders of the Jessens after the signing ceremony in March 2007, have disappeared. Among the personal items left behind in the Aim High office by David Butziger was a copy of an early draft of the employment agreement for Hanna.
Hanna Ricna-Jessen accepted her termination and immediately left Aim High employment. Lorin was allowed to stay at his election. He remained as a coach at Aim High for several months. However, by the fall of 2008, Aim High management had received information concerning the start up of a new gym in Warwick. The newly opened facility, known as RISE, had registered with USAG. RISE had also allegedly "taken" seven of Aim High's competitive gymnasts. Fearing the loss of students to a new gym located so close to Aim High, Robert Nelson inquired of Lorin whether or not, as Nelson had heard, Hanna and Butziger had started a facility for gymnasts on Jefferson Boulevard. Lorin replied that both were involved in the Warwick facility.
Lorin Jessen left the employ of Aim High on October 2, 2008. By this time, Butziger had opened his gymnasium on Jefferson Boulevard, allegedly without a coaching staff other than himself.[7] Butziger's testimony, particularly his claim to have never discussed employment of the Jessens at his gym or compensation for any coaching they might perform there, was incredulous.
Although Robert Nelson, Aim High's treasurer, conceded that the loss of the seven students to RISE would not constitute a significant economic harm to Aim High, additional *Page 7 
evidence strongly supports Aim High's argument that the solicitation of coaches[8] and students by RISE could result in significant harm to Aim High's economic bottom line.
In sum, this Court finds by clear and convincing evidence that both Lorin Jessen and Hanna Ricna-Jessen signed written documents identical to Exhibits 1 and 2, knowing the contents thereof including the non-compete features of the agreements. Additional facts will be provided as necessary to the discussions which follow.
 Standard for Issuance of Preliminary Injunction
In deciding whether to issue a preliminary injunction, it is the role of the hearing justice to determine whether the moving party:
 (1) has a reasonable likelihood of success on the merits, (2) will suffer irreparable harm without the requested injunctive relief, (3) has the balance of the equities, including the possible hardships to each party and to the public interest, tip in its favor, and (4) has shown that the issuance of a preliminary injunction will preserve the status quo. Iggy's Doughboys, Inc. v. Giroux, 729 A.2d 701, 705 (R.I. 1999).
It is well-settled that the moving party is not required to establish a certainty of success when proving the likelihood of success on the merits, but instead is merely required to make out a prima facie case.DiDonato v. Kennedy, 822 A.2d 179, 181 (R.I. 2003) (citing Fund forCommunity Progress v. United Way of Southeastern New England,695 A.2d 517, 521 (R.I. 1997)). Moreover, "[i]n considering the equities, the hearing justice should bear in mind that `the office of a preliminary injunction is not ordinarily to achieve a final and formal determination of the rights of the parties or of the merits of the controversy, but is merely to hold matters approximately in status quo, and in the meantime to prevent the doing of any acts whereby the rights in question may be irreparably injured or endangered.'" Id. (citing Fund for *Page 8 Community Progress, 695 A.2d at 521 (quoting Coolbeth v. Berberian,112 R.I. 558, 565, 313 A.2d 656, 660 (1974))).
 Injunctive Relief
This Court concludes that Aim High made out a prima facie case and, thus, established the likelihood of success on the merits of its case.See DiDonato, 822 A.2d at 181. Although the whereabouts of the original signed copies of the agreements is unknown, it is the determination of this Court that there is credible evidence to support a finding that both Jessens signed Confidential Disclosure and Non-Competition Agreements identical to Exhibits 1 and 2.
The Rhode Island Statute of Frauds bars any action based on an agreement that cannot be performed within one year, unless it is in writing and signed. The statute provides, in relevant part, that
 [n]o action shall be brought . . . to charge any person upon any agreement which is not to be performed within the space of one year from the making thereof; . . . unless the promise or agreement upon which the action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him or her thereunto lawfully authorized. G.L. 1956 § 9-1-4.
Our Supreme Court has concluded that because a contract could possibly be rescinded, or because an obligated party could have possibly died, do not mean that a contract would be performed if either occurred, but rather both would simply result in defeasance. See Doughty v.Cliffordline Chemical Co., 96 R.I. 223, 190 A.2d 480, 482 (1963);Wagniere v. Dunnell, 29 R.I. 580, 73 A. 309, 310 (1909).
With respect to the Confidential Disclosure and Non-Competition Agreement, the key inquiry is the date of the "making" of the agreement.See Section 9-1-4 ("any agreement which *Page 9 
is not to be performed within the space of one year from the making thereof" falls within the statute of frauds). The pertinent provisions of the identical agreements are as follows:
 4. Employee agrees that any disclosed information is to be held and maintained in strict confidence and shall not be disclosed directly or indirectly to others except those working with Employee in connection with the performance of employment duties with AHA or as authorized by AHA. This provision shall continue during the entire period from commencement of employment until one year after termination of employment. . . .
 6. During the period from commencement of employment until one year after termination of employment, Employee will not compete, either directly or indirectly, with AHA whether as an individual, officer, director, agent, employee or stockholder or in any other capacity in any business, enterprise or organization serving any location in Rhode Island. In the event that this provision shall be determined by any court of competent jurisdiction to be unenforceable by reason of its extending to too great a period of time, over too large a geographical area, or over too great a range of activities, it shall be interpreted to extend only over the maximum period of time, geographic area or range of activities as to which it may be enforceable.
Aim High alleges in its Amended Verified Complaint that the agreements were executed on or about March 5, 2007. In Defendants' Answer to Plaintiff's Amended Complaint, the Jessens admit that they were employees of Aim High beginning March 5, 2007. Because the one-year term of this contract provision could not begin until the Jessens' employment was terminated, it could not "be performed within the space of one year from the making thereof." *Page 10 
Section 9-1-4. Accordingly, any similar oral agreement would be barred by the statute of frauds because it must be "in writing, and signed by the party to be charged therewith." Id.
Our Supreme Court has opined that "the resolution of a dispute concerning if and when contract negotiations materialize into a mutual understanding and resulting binding contract is ordinarily a question of fact for the factfinder." Marshall Contractors, Inc. v. BrownUniversity, 692 A.2d 665, 670 (R.I. 1997). Thus, it is for the factfinder to evaluate the evidence before it, including the conflicting testimony of the parties, and determine whether or not the agreement was ever signed by the parties. After reviewing the credible evidence before it, this Court finds that both Jessens signed Confidential Disclosure and Non-Competition Agreements identical to Exhibits 1 and 2, thereby satisfying the statute of frauds. Additionally, this Court finds that the Confidential Disclosure and Non-Competition Agreements are enforceable in part as will be discussed below. See Durapin, Inc. v.American Products, Inc., 559 A.2d 1051, 1053 (1989).
This Court is similarly satisfied that Aim High will suffer irreparable harm to its business if the requested injunctive relief is not granted. See Iggy's Doughboys, Inc., 729 A.2d at 705. If not prevented from doing so, the Jessens will have free rein to solicit Aim High's customer base, and use coaching programs and similar business secrets of Aim High in their own business. "This is precisely the type of irreparable injury for which an injunction is appropriate since a legal remedy such as monetary damages would be inadequate to compensate the victim for its loss." Fund for Community Progress, 695 A.2d at 523;see also Iggy's Doughboys, Inc., 729 A.2d at 705 (quoting Fund forCommunity Progress, 695 A.2d at 523) ("[P]rospective damage to a business's good will and reputation `is precisely the type of irreparable injury for which an injunction is appropriate.'"). *Page 11 
This Court is aware of the current economic conditions in the State of Rhode Island which makes securing almost any employment difficult. There are between 10 and 20 venues in the state where students may be coached in gymnastics. Thus, Aim High, although enjoying a student population of approximately 1200 children and youth, is accustomed to economic competition. But for the employment agreements which were signed by the Jessens, they could attempt to secure employment in Rhode Island and thereby avoid what would otherwise likely be another disruptive and expensive family move to another state.
However, the Jessens did accept the strictures of the Confidential Disclosure and NonCompetition Agreement features of the employment contract as part of the bargain for their jobs with Aim High. As previously found, this agreement was necessary to protect Aim High from irreparable harm, and "the issuance of a preliminary injunction will preserve the status quo" of the parties. Iggy's Doughboys, Inc.,729 A.2d at 705. An injunction will — until the final and formal determination of the rights of the parties — prevent the Jessens from "the doing of any acts whereby the rights in question may be irreparably injured or endangered." DiDonato, 822 A.2d at 181 (citing Fund forCommunity Progress, 695 A.2d at 521 (quoting Coolbeth, 112 R.I. at 564,313 A.2d at 660)). After considering all of these factors, this Court finds that the equities tip in favor of Aim High, providing that some modification to the scope of the non-competition agreement is made by this Court.
Although our Supreme Court has held that non-competition agreements are not void as a matter of law, such provisions are not favored and are subject to judicial scrutiny to determine whether they are enforceable in whole or in part. See Durapin, Inc., 559 A.2d at 1053 (citingOakdale Manufacturing Co. v. Garst, 18 R.I. 484, 489, 28 A. 973, 974-75
(1894)). A party seeking to enforce such a provision must establish that "(1) the provision is ancillary to an *Page 12 
otherwise valid transaction or relationship, such as an employment contract . . ., (2) the provision is supported by adequate consideration, and (3) there exists a legitimate interest that the provision is designed to protect." Id. (citations omitted.) If these are established, the issue of whether such a provision is enforceable is a question of law for the Court. Id. (citing Chapman Drake v.Harrington, 545 A.2d 645, 647 (Me. 1988)).
Such contracts "will be enforced as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." Id. In making this determination, "the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement."Id. (citing Max Garelick, Inc. v. Leonardo, 105 R.I. 142, 147,250 A.2d 354, 356-57 (1969)). "Partial enforcement should be applied in those instances wherein nothing is wrong with the agreement except that the parties have agreed on some restraint that is somewhat greater than required to protect the legitimate interests of the promisee."Durapin, Inc., 559 A.2d at 1059 (citing 6A Corbin on Contracts, § 1390 (1962)); see also Max Garelick, Inc., 105 R.I. at 148, 250 A.2d at 357
("[W]here restrictive covenants contained in an agreement are divisible, the restraints set out therein will be valid to the extent that they are reasonably necessary for the protection of the interest of the person for whose benefit they are intended, are not unreasonably restrictive of the rights of the person who is so restrained, and are not contrary to public policy.").
The Jessens concede that they began working at Aim High on March 5, 2007. This clearly establishes an employment relationship between the parties and, thus, satisfies the first requirement. See Id.;see also Cranston Print Works Company v. Pothier, 848 A.2d 213, 219 n. 2 (R.I. 2004) (quoting Restatement (Second) Contracts § 188 (1981)) ("Promises imposing restraints that are ancillary to a valid transaction or relationship include . . . a promise by an *Page 13 
employee or other agent not to compete with his employer or other principal."). With respect to the second requirement, the Jessens agreed that they were to start their employment at an approximate salary of $34,000 each. The Court is satisfied that continuing employment at this salary was adequate consideration for making the agreement in issue. The third requirement — that this provision protect a legitimate interest — requires more in-depth analysis in order to determine the level of protection necessary in this case. This Court will now analyze both the confidential disclosure provision and the non-competition provision to determine the extent of restraint necessary to protect Aim High's interests.
 Confidential Disclosure
This Court must first analyze the interests that Aim High has sought to protect by way of the non-disclosure aspect of the agreement. According to this provision, the following items are deemed to be "proprietary and confidential material" and "disclosed information" within the scope of the confidential disclosure provision: (1) customer lists; (2) information on customers; (3) programs, coaching, and training information; (4) credit information on customers; (5) information on management and organization of Aim High; and (6) know-how and proprietary programs of Aim High.
With regards to the first item, "[e]quitable protection will be provided against the competitive use of a list of customers which is confidential in nature." Home Gas Corp. of Massachusetts, Inc. v.DeBlois Oil Company, 691 F. Supp. 567, 574 (D. RI. 1987). This "depends upon how readily ascertainable the information is for a person conducting an independent investigation." Id. Further, the list must be "readily ascertainable through ordinary business channels or business directories." Id. (citing Callahan v. R.I. Oil Co., 103 R.I. 656, 660,240 A.2d 411, 413 (1968)). Because the student customer list is not readily ascertainable — and *Page 14 
this Court will not find this information to be so because an "energetic spy" would be able to acquire by observation a list of students who attend Aim High Academy — this Court finds that Aim High is entitled to equitable protection of its customer lists. See id. (quotingColonial Laundries, Inv. v. Henry, 48 R.I. 332, 336-37, 138 A. 47, 48-49
(1927)); c.f. Durapin, Inc., 559 A.2d at 1057 (court concluded that the identity of the duckpin customers on the list in question was common knowledge because the National Duckpin Congress book lists all duckpin alleys in the country).
This Court similarly finds that Aim High's customer information, including its customers' credit information, is entitled to equitable protection. The First Circuit Court of Appeals has previously held that a customer information card, which included the name and address of each customer, their specialized requirements, the contact person for each customer, and the companies' pricing policies, were confidential and could not be used to the benefit of the former employee at the employer's expense. See American Eutectic Welding Alloys Sales Co. v.Rodriguez, 480 F.2d 223, 226 (1st Cir. 1973); see also Home Gas Corp. ofMassachusetts, Inc., 691 F.Supp. at 575 (court held that plaintiff had a protectable interest in its customers' credit histories because it was not readily ascertainable). The remaining items — Aim High's programs, coaching, and training information; information on Aim High's management and organization; and proprietary programs of Aim High — are equally entitled to equitable protection because they involve confidential business information and secrets. See Nestle Food Company v.Miller, 836 F. Supp. 69, 76 (D. R.I. 1993) ("[Plaintiff] surely has a right to prohibit the use of its `confidential information' for the benefit of another company. . . ."); see also American Eutectic WeldingAlloys Sales Co., 480 F.2d at 228-29. *Page 15 
Because Aim High's customer list is not readily ascertainable and, thus, entitled to equitable protection, this Court further finds that the Jessens should be restricted from soliciting business from Aim High's customers. Cf. Durapin, Inc., 559 A.2d at 1057 (plaintiff "could not prevent Durapin from doing business with the customers themselves because they did not constitute a protectable interest"). Prohibiting the Jessens from accepting unsolicited clients, however, "unfairly limits the defendants' entrepreneurial rights[,]" and, thus, they will only be barred from soliciting Aim High's clients for one year following the termination of the Jessens' employment. J. B. Prata, LTD. v.Bichay, 468 A.2d 266, 268 (R.I. 1983). This will protect Aim High only to the point that it is necessary. It will also cause no undue hardship on the Jessens because they will be free to engage in their business profession in Rhode Island — with the exception of Aim High's clients — as discussed below. See Home Gas Corp. of Massachusetts, Inc.,691 F. Supp. at 575.
 Non-Competition Agreement
A similar analysis must be made with respect to the non-competition portion of the agreement. Although not required, courts generally look at whether such restraints have temporal and geographical limitations in determining whether they are reasonable. See Cranston Print WorksCompany, 848 A.2d at 219; see also Max Garelick, Inc., 105 R.I. at 147,250 A.2d at 356 (quoting Oakdale Mfg. Co., 18 R.I. at 489, 28 A. at 974
("`[C]ontract in restraint of trade are not necessarily void by reason of universality of time, . . . nor of space . . .; but they depend upon the reasonableness of the restrictions under the conditions of each case.'"). As recognized by our Supreme Court, the Restatement has also proved helpful in determining whether a restraint is unreasonable:
 A promise to refrain from competition that imposes a restraint . . . is unreasonably in restraint of trade if (a) the restraint is greater *Page 16 
than is needed to protect the promisee's legitimate interest, or (b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public. Id. at 219 n. 2 (quoting Restatement (Second) Contracts § 188 (1981)).
Our Supreme Court has upheld restraints in certain situations where it deemed protection of a legitimate interest necessary. For example, the Court upheld protection of goodwill acquired in the purchase of a business, where competition by the seller would deprive the consideration paid by the buyer. See Koppers Products Co. v.Readio, 60 R.I. 207, 197 A. 441 (R.I. 1938). The Court has also upheld protection where a plaintiff had trained the defendant in unique or novel services in exchange for which the defendant agreed not to use those skills to compete against the original employer. See Max Garelick,Inc., 105 R.I. at 148, 250 A.2d at 357. It is well-settled under Rhode Island law, however, that "the desire to be free from competition, by itself, is not a protectable interest." Durapin, Inc., 559 A.2d at 1057;see also Home Gas Corp. of Massachusetts, Inc., 691 F. Supp. at 573
("[Plaintiff] must show it has a legitimate interest in preventing [Defendant] from engaging in the same business and that it is not simply attempting to restrain competition.").
This Court finds that Aim High is not merely attempting to restrain competition, but rather, considering the nature of the position and specialized techniques and programs utilized by Aim High, is justified in seeking protection. See Max Garelick, Inc., 105 R.I. at 148,250 A.2d at 357. The non-competition provision as written, however, is overbroad and must be tailored by this Court. See Durapin, Inc, 559 A.2d at 1053.
As previously set forth, the provision states that the Jessens "will not compete, either directly or indirectly, with AHA whether as an individual, officer, director, agent, employee or stockholder or in any other capacity in any business, enterprise or organization servingany *Page 17 location in Rhode Island." (Emphasis added.) This provision prohibits the Jessens from virtually any employment in this entire state. Aim High is located in a suburban setting in what is close to the geographical center of the state. However, the majority of Rhode Island citizens live to the north of Aim High in cities such as Providence, Cranston, Warwick, Pawtucket and Woonsocket. Because enforcement of paragraph 6 of the agreements would prevent the Jessens from being employed in their sole field of expertise and experience anywhere in the state, this Court finds that it is both unnecessary and unfair, and simply unreasonable considering the circumstances. See Oakdale Mfg. Co., 18 R.I. at 489,28 A. at 974. Accordingly, this Court will modify the Non-Competition Agreement in one respect. The non-compete feature of the agreements will be geographically limited to a 15 mile radius of the current Aim High facility in East Greenwich, Rhode Island.[9]
 Conclusion
Because this Court is satisfied that the Jessens did in fact sign a Confidential Disclosure and Non-Competition Agreement, and the Court finds the agreement to be enforceable in part, Aim High has established the likelihood of success on the merits of its case. Furthermore, this Court is satisfied that Aim High will suffer irreparable harm if an injunction does not issue. Finding that the equities tip in Aim High's favor, an injunction will act "merely to hold matters approximately in status quo, and in the meantime to prevent the doing of any acts whereby the rights in question may be irreparably injured or endangered."DiDonato, 822 A.2d at 181 (citing Fund for Community Progress,695 A.2d at 521 (quoting Coolbeth, 112 R.I. at 564, 313 A.2d at 660)). *Page 18 
In issuing this injunction, this Court is certain that the Court's modification of the agreement will adequately protect Aim High's legitimate business interests without causing an undue hardship to the Jessens.
This injunction shall expire in all respects on May 19, 2009.
[1] An Amended Verified Complaint was filed by Aim High on October 20, 2008. That pleading added David A. Butziger as a defendant, as well as several claims in addition to the injunctive relief initially sought against the Jessens.
[2] Butziger was fired after it was learned that he had allegedly altered payroll schedules and transferred cash to another employee without approval.
[3] Much of Lorin Jessen's testimony was incredulous.
[4] This Court finds remarkable that despite the information about many student injuries suffered at the facility operated by the Jessens, information which was conveyed in the e-mail, Aim High apparently never reconsidered its decision to hire them. A note on a paper copy of the e-mail, written by Robert Nelson to his daughter, reflects his recommendation that a non-compete agreement be executed by the Jessens before they "step into the gym." (See Exhibit 5.)
[5] Nelson recalls that because of an earlier request made by the Jessens regarding partial payment of health insurance, a paragraph was added to the original draft in order to provide for partial coverage. (See Exhibits 1 and 2, paragraph 9.)
[6] Sherri Jackson's testimony reflected a similar recollection regarding the execution of the employment agreements by the Jessens.
[7] Butziger has no credentials as a gymnastics coach.
[8] In addition to the loss of seven students in early October, coaches employed by Aim High were apparently contacted by RISE with an eye toward offering them employment at the Warwick facility.
[9] Plaintiff suggested this geographic modification to the non-competition provision of the employment contract during oral argument. Although the distance is not derived from any demographic or other type of study, this Court finds it reasonable. The Court understands through common knowledge that more than half of the state's population resides outside the 15 mile radius.